# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

GILBERT POSTELLE,         )
                                    )

          Petitioner,      )
                                    )

Vs.                    )      Case No. CIV-12-1110-F
                                    )

TERRY ROYAL, Warden,     )
   Oklahoma State Penitentiary  )
                                    )

         Respondent.     )

## MEMORANDUM OPINION

Petitioner, a state court prisoner, has filed a petition for writ of habeas corpus seeking relief pursuant to 28 U.S.C. § 2254. Doc. 19. Petitioner challenges the convictions entered against him in Oklahoma County District Court Case No. CF-05-4759. Tried by a jury in 2008, Petitioner was found guilty of four counts of first degree murder and one count of conspiracy to commit murder in the first degree. Petitioner was sentenced to death on two of the first degree murder convictions, life without parole on the other two, and 10 years in prison for the conspiracy conviction. In support of his death sentences, the jury found two aggravating circumstances, namely, (1) during the commission of the murder, the defendant knowingly created a great risk of death to more than one person, and (2) the murder was especially heinous, atrocious, or cruel. Criminal Appeal Original Record (hereinafter "O.R.") VIII, at 1550-53.

Petitioner has presented five grounds for relief. Respondent has responded to the petition and Petitioner has replied. Docs. 19, 39, and 48. In addition to his petition, Petitioner has filed motions for discovery and an evidentiary hearing. Docs. 20 and 30. After a thorough review of the entire state court record (which

Respondent has provided), the pleadings filed in this case, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to his requested relief.

## I. Procedural History.

Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals (hereinafter "OCCA"). The OCCA affirmed in a published opinion. *Postelle v. Oklahoma*, 267 P.3d 114, 147 (Okla. Crim. App. 2011). Petitioner sought review of the OCCA's decision by the United States Supreme Court, which denied his writ of certiorari on October 1, 2012. *Postelle v. Oklahoma*, 133 S. Ct. 282 (2012). Petitioner also filed a post-conviction application, which the OCCA denied in an unpublished opinion. *Postelle v. Oklahoma*, No. PCD-2009-94 (Okla. Crim. App. Feb. 14, 2012).

## II. Facts.

In adjudicating Petitioner's direct appeal, the OCCA set forth a summary of the facts. Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct." Although this presumption may be rebutted by Petitioner, the Court finds that Petitioner has not done so, and that in any event, the OCCA's statement of the facts is an accurate recitation of the presented evidence. Thus, as determined by the OCCA, the facts are as follows:

> On Memorial Day, 2005, James Donnie Swindle, Terry Smith, Amy Wright and James Alderson were shot to death outside Swindle's trailer located next to a salvage yard and alignment shop in an industrial area of Del City, Oklahoma. [FN2] Several witnesses in the area heard multiple gunshots and saw a maroon Dodge Caravan leaving the salvage yard shortly after the shots were fired. The owner of a flower shop nearby saw four men in the minivan; she testified that the men had dark hair and that she believed they were either Caucasian or Hispanic. A security camera across the street from the salvage yard captured on videotape the minivan entering and leaving the salvage yard driveway. Neither the license tag nor the occupants

could be seen on the videotape. Sandra Frame, a bartender working at a bar next to the alignment shop, heard gunshots around 6:15 p.m. She heard the minivan accelerating and saw it leaving the crime scene. She could see there were at least two men in the minivan and she observed them laughing. She glimpsed the man in the passenger seat for a few seconds; he was young with dark hair and facial hair, possibly Hispanic. She was later shown a photographic lineup and was "eighty-five percent sure" that David Postelle was the man she saw in the passenger seat of the minivan that day.

[FN2] James Donnie Swindle was known as and referred to throughout the record as Donnie Swindle.

Oklahoma City Police Officer Rocky Gregory was on traffic duty down the street from the salvage yard when two people approached him and reported hearing gunfire from the vicinity of the salvage yard. Gregory and his partner investigated and found Smith and Swindle, each dead from multiple gunshot wounds. The bodies of the two other victims, Alderson and Wright, were discovered further north after other officers arrived.

Several people who were at the Postelle home on Memorial Day testified at Gilbert Postelle's trial, including Crystal Baumann, [FN3] Arthur Wilder, [FN4] Alvis "Jay" Sanders [FN5] and Randall Byus. [FN6] The Postelle home was routinely used by these four and others as a place to smoke methamphetamine in the "smoke room." Memorial Day 2005 was no different. Crystal Baumann and Arthur Wilder, admitted methamphetamine addicts, testified they had gone to the Postelle home on Memorial Day to get high. On that day, they both said, Gilbert and David Postelle talked about their belief that Donnie Swindle was responsible for the motorcycle accident that left their father, Brad, both physically and mentally impaired. [FN7] Wilder recalled Gilbert and David Postelle naming Swindle as one of those responsible for the accident and saying that those responsible were "going to pay" for the damage done to their father. [FN8] Their conversation subsequently turned to target shooting. Wilder had come equipped with his newly acquired MAK–90 rifle to go target shooting with the Postelle brothers. [FN9] David Postelle had an SKS rifle he used for target practice. Because they needed ammunition, Gilbert Postelle, Baumann and Wilder went to a house in Del City where a

friend gave Gilbert Postelle a speed loader for the MAK–90 rifle and a bag of bullets that could be used in both the MAK–90 and SKS rifles.

[FN3]  Baumann faced charges for several crimes related to this case. She entered into an immunity agreement in August 2005 providing for her full cooperation with the State to prosecute these murders in exchange for immunity from prosecution for any crimes she could be held liable for stemming from this incident, provided there would be no immunity from prosecution for any crime that would make Baumann a principal to the crime of homicide in any degree. (Defendant's Exhibit 35).

[FN4] Wilder was charged with Accessory After the Fact, Unlawful Possession of a Firearm, Concealing Stolen Property and Possession of a Sawed-off Shotgun. Wilder entered a blind plea and was sentenced to 180 years imprisonment subject to one-year judicial review. On judicial review, Wilder agreed to testify and his sentence was vacated by the sentencing judge, who agreed to entertain a new recommendation following the trials related to this matter. Wilder signed an Agreement to Cooperate and Testify Truthfully that provided he would be allowed to withdraw his original plea and re-enter a new plea of nolo contendere to the previous charges, plus some drug charges, and receive five years on each count to be served concurrently and with credit for time served. Wilder testified that the acceptance by the court of this plea bargain would result in his release from prison because of his credit for time served. (Defendant's Exhibit 41).

[FN5] Sanders entered a guilty plea to Accessory After the Fact to the offense of First Degree Murder for his disposal of evidence after the murders. In exchange for his truthful testimony, the State recommended, and Sanders was given, a 12–year split sentence per his plea agreement of six years imprisonment with the remaining six years suspended. According to Sanders, he had discharged his sentence by the time of Postelle's trial. (Defendant's Exhibit 38).

[FN6] Byus was originally charged in the same Information with Postelle with four counts of First Degree Murder and one count of Conspiracy to Commit Murder. He pled guilty to Accessory to a Felony (First Degree Murder). In exchange for his truthful testimony, the State agreed to recommend a split sentence of six years imprisonment with the remaining fourteen years suspended. (Defendant's Exhibit 39).

[FN7] Gilbert Postelle's father, Earl Bradford Postelle, was referred to as "Brad" throughout the record.

[FN8] There was also testimony that David and Gilbert Postelle were angry with Swindle because Swindle allowed someone to steal parts off of one of their cars that was stored on Swindle's property.

[FN9] Wilder's rifle was referred to by several witnesses as an AK–47, but the State's firearm and toolmark examiner identified it as a MAK–90.

Later that day, Gilbert, David and Brad Postelle, along with Wilder, Baumann and Randall Byus left in the Postelles' maroon Dodge Caravan. Baumann denied knowing about a plan to shoot Swindle at the time they left. She and Wilder were dropped off at the home of Wilder's brother. Wilder, however, testified that he had heard the Postelles talking about a plan to go to Swindle's house and shoot him. He was unsure they would go through with it, but their conversation worried Wilder enough to insist the Postelles take him and Baumann home. Hours later David Postelle returned Wilder's MAK–90 to him. Wilder and Baumann took the gun to their storage unit and hid it. Wilder heard about the murders from a friend, put "two-and-two together" and worried that the rifle he had left in the Postelles' minivan had been used in the murders. Wilder's fear that the Postelles had used his rifle to commit murder was confirmed when he saw the Postelles' minivan leaving Swindle's property on a surveillance camera video on the local news. A few days after the murders, Gilbert Postelle told Wilder how he had chased everyone outside after breaching the door of Swindle's trailer and how he then shot them outside. Gilbert Postelle then noticed Baumann standing nearby and ordered her to keep quiet about what she had overheard.

Jay Sanders testified that he had been living at the Postelle home the month before the murders. [FN10] Sanders said that the patriarch, Brad Postelle, talked about having bad dreams about his motorcycle accident and his conviction that Swindle was responsible for that accident. According to Sanders, Gilbert and David Postelle were devastated by the accident and its effect on their father.

[FN10] Sanders's real name is Alvis Earl Sanders, Jr. but he was known as and referred to as "Jay."

On Memorial Day, Sanders said he was in and out of the smoke room throughout the day, getting high and working on his broken-down van. Sanders was in the smoke room when he learned that the Postelles were going to go target shooting. Sanders said someone put the SKS rifle in the Postelles' minivan, and he helped Brad Postelle into the van. David, Gilbert and Brad Postelle left with Wilder and Byus, but only the Postelles returned. [FN11] Later that night or the next morning, Sanders learned of the murders from the news; all the television sets in the Postelle home were tuned to news stations showing the security videotape of the minivan entering and leaving the murder scene. The Postelles also received several telephone calls from friends telling them about the murders. Sanders recalled that the Postelle home had "a different kind of atmosphere" and that there was a lot of whispering among the Postelle family.

[FN11] Sanders recalled that Baumann left in another vehicle with a friend.

Sanders testified that a couple of days after the murders, the Postelles were discussing different ideas about what to do with the minivan "since it might be the van on the news." It was decided that Sanders and Daniel Ashcraft would take the minivan to Indiana, set it on fire and ultimately put it in a lake. [FN12] Sanders wiped the van down and drove it to Indiana to the home of a Postelle relative. Sanders also purged the Postelle home of drugs and drug paraphernalia. He buried gun parts and the minivan license plate in the backyard. After Sanders returned from Indiana, he was privy to a conversation in which Gilbert Postelle said, "I shut that bitch up in the corner" and mimed shooting a rifle at someone. Sanders testified that

he, Gilbert, David and some other Postelle family members discussed fabricating a story for the police to shield the Postelles from being implicated in the murders.

[FN12] Sanders and Ashcraft did not follow through with burning the van and submerging it in a lake. The police later found the van.

The State's firearm and toolmark examiner examined the many casings collected at the murder scene and determined that they were fired from two guns: Wilder's MAK–90 rifle and another rifle, possibly an SKS rifle. David Postelle's SKS rifle was never found. Law enforcement located the Postelles' van in Indiana and searched it. The alterations to the van observed by the investigators were consistent with Sanders's testimony about efforts to disguise it.

Randall Byus was with the Postelles when they shot the victims. According to Byus, he accompanied the Postelles, Wilder and Baumann, believing the Postelles were taking Baumann and Wilder home and then going target shooting. He saw Wilder's MAK–90 and David Postelle's SKS rifle in the Postelles' minivan. Nothing appeared unusual as they dropped off Baumann and Wilder. When David Postelle turned the van around and headed away from their normal place for target shooting, Byus asked where they were going, and was told that they were going to Swindle's house first, for some "shit," which Byus understood meant drugs. Byus first understood the Postelles' murderous plan when Gilbert Postelle asked his father a block from Swindle's trailer what to do if Donnie Swindle's father was there and Brad Postelle said to kill everybody there. Byus voiced disbelief and Brad Postelle responded that Donnie Swindle had tried to kill him. At the trailer, Byus witnessed Gilbert Postelle open the van door and shoot Terry Smith, who was near the minivan, in the face. Gilbert Postelle and his father then shot Donnie Swindle, causing him to fall to the ground. Swindle looked up and asked what was going on and David Postelle took the gun from his father and shot Swindle in the head. Gilbert Postelle turned and ran through the trailer, looking for others and firing his gun. He emerged and chased down James Alderson and shot him as Alderson tried to seek cover under a boat. After David Postelle told his cadre to get in the van, Byus heard two more shots. When Gilbert Postelle got in the van, he

said, "that bitch almost got away." As they drove away, Brad Postelle hugged his sons and said, "That's my boys." On the way back to the Postelle home, the Postelles warned Byus against telling anyone what they had done.

*Postelle*, 267 P.3d at 123-26.

## III.  Standard of Review.

### A.  Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity.  It provides that before a federal court can grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies.  As acknowledged in *Coleman v. Thompson*, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28 U.S.C. § 2254(b).  Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

### B.  Procedural Bar.

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the claim presented.  "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman*, 501 U.S. at 729).  "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729-30.

## C.    Merits.

When a petitioner presents a claim to this Court, the merits of which have been addressed in state court proceedings, 28 U.S.C. § 2254(d) governs his ability to obtain relief.  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (acknowledging that the burden of proof lies with the petitioner).  Section 2254(d) provides as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The focus of Section 2254(d) is on the reasonableness of the state court's decision. "The question under AEDPA [Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  *Harrington v. Richter*, 562 U.S. 86, 102 (2011).  Relief is warranted only "*where there is no possibility* fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."  *Id.* (emphasis added).

The deference embodied in "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102-03 (citation omitted). When reviewing a claim under Section 2254(d), review "is limited to the record that was before the state court that adjudicated the claim on the merits." *Pinholster*, 563 U.S. at 181.

## IV. Analysis.

### A. Ground One: Ineffective Assistance of Counsel.

Petitioner claims that his trial and appellate counsel were ineffective. Specifically, Petitioner claims that trial counsel was ineffective for (1) not fully cross-examining and impeaching Randall Byus; (2) failing to raise mental retardation as a defense to the death penalty and as mitigating evidence; (3) failing to present complete and persuasive mitigating evidence; and (4) failing to develop and present evidence about Petitioner's mental illnesses. Petitioner faults appellate counsel for not raising these claims on direct appeal. Petitioner first raised these claims in his post-conviction application. *Postelle*, No. PCD-2009-94, slip op. at 9-21. The OCCA observed that the trial counsel claims were waived, yet still addressed and denied the claims on their merits as well. *Id.* at 9-17. The OCCA denied the appellate counsel claims on the merits. *Id.* at 18-21.

### 1. *Unexhausted claims*.

Before bringing a habeas action, petitioners exhaust their claims by "fairly presenting" them in state court. *Picard v. Connor*, 404 U.S. 270, 275 (1971); 28 U.S.C. § 2254(b)(1)(A). A petitioner need not provide "book and verse on the federal constitution," but they must go beyond simply presenting the facts supporting the federal claim or articulating a "somewhat similar state-law claim."

*Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006) (quoting *Picard*, 404 U.S. at 278, and *Anderson v. Harless*, 459 U.S. 4, 6 (1982)). Instead, the petitioner must have raised the substance of the federal claim in state court. *Id.*

Petitioner claims that his trial counsel was ineffective for not impeaching Randall Byus with a past burglary charge. But nowhere in his state court proceedings did he raise that challenge. Original Appl. for Post-Conviction Relief at 6-9. Petitioner also never raised an ineffective assistance of appellate counsel claim based on the burglary charge. Because Petitioner did not fairly present either the trial counsel or appellate counsel ineffectiveness claims based on Byus' burglary charge to the state court, those claims are unexhausted.

## 2. *Procedural bar.*

Generally, federal courts will dismiss unexhausted claims without prejudice and allow the petitioner to raise the claim in state court. *Bland*, 459 F.3d at 1012. But when the state court would find the claim procedurally barred under an independent and adequate procedural bar, "there is a procedural default for purposes of federal habeas review." *Id.* (quoting *Dulin v. Cook*, 957 F.2d 758, 759 (10th Cir. 1992)). Oklahoma defendants cannot apply for post-conviction relief on issues that could have been raised "previously in a timely original application or in a previously considered application . . . ." OKLA. STAT. tit. 22, § 1089(D)(8). Randall Byus' conviction was part of the public record since before Petitioner's trial. Petitioner could have raised the trial counsel claims either on direct appeal or in his application for post-conviction relief, but failed to do so. Petitioner could have raised the appellate counsel claims in his post-conviction proceeding, but did not. Therefore, Oklahoma law would now bar those claims.

The Petitioner does not mount any serious challenge to the independence or inadequacy of Oklahoma's procedural bar, as he only mentions in passing that he "disputes" that issue. Petition at 13. Petitioner's conclusory assertion fails to convince this Court that Oklahoma's oft-approved procedural bar is inadequate or dependent on federal law as applied to this claim. *See Fairchild v. Trammell*, 784 F.3d 702, 719 (10th Cir. 2015); *Banks v. Workman*, 692 F.3d 1133, 1145-46 (10th Cir. 2012); *Thacker v. Workman*, 678 F.3d 820, 835-36 (10th Cir. 2012).

Contrary to Petitioner's arguments, appellate counsel ineffectiveness cannot excuse the default. Ineffective assistance of appellate counsel can only serve as cause if the defendant raised that ineffective assistance claim in state court. *Edwards v. Carpenter*, 529 U.S. 446, 451-52 (2000). Petitioner did not raise appellate ineffectiveness based on the burglary charge in his post-conviction proceeding. Any attempt to raise that ineffectiveness claim in a second post-conviction proceeding would be procedurally barred, as the grounds for that claim would have arisen when it was apparent that appellate counsel did not raise the claim, which would be when counsel filed the appellate brief. Since Petitioner cannot establish cause to excuse the default of the unexhausted ineffective assistance of trial counsel claim, the claim is denied as procedurally barred. As for the appellate ineffectiveness claim, Petitioner does not offer any cause to excuse that default. That claim is also procedurally barred.

Respondent argues that Petitioner's other ineffectiveness claims are barred as well, because the OCCA noted in its order that those claims were waived. The Court agrees with Respondent that it must acknowledge and apply the Oklahoma procedural bar even though the OCCA also reached the merits of Petitioner's claims. *See Thacker*, 678 F.3d at 834 n.5. But the Court may "bypass the procedural issues and reject a habeas claim on the merits" when the "questions of

procedural bar are problematic." *Cannon v. Mullin*, 383 F.3d 1152, 1159 (10th Cir. 2004). The Court faces such a situation here, as the parties' briefs present an adequacy problem related to the Oklahoma procedural bar.

The Tenth Circuit has recognized that a lack of separate trial and appellate counsel undermines the adequacy of a state procedural bar. *See English v. Cody*, 146 F.3d 1257, 1263 (10th Cir. 1998). And there are situations where two different attorneys working in the same office can be considered non-separate. *Cannon*, 383 F.3d at 1173-74. Respondents have asserted that the OCCA's procedural bar applied on post-conviction was adequate, because the Petitioner had different trial and appellate attorneys. Here, however, Petitioner argues that the attorneys were not separate, because they worked in the same office. Rather than untangling the various factors and determining whether counsel was, or was not, separate, the Court exercises its discretion to bypass the procedural morass and dispose of the ineffectiveness claims on their merits.

### 3. *Clearly established law.*

Counsel is constitutionally ineffective when counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). On habeas review, courts must apply the highly deferential standards of *Strickland* and the AEDPA to the facts of the case and decide whether "there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Harrington*, 562 U.S. at 101, 105. Courts cannot disturb a state court's ruling unless the petitioner demonstrates that the state court applied the highly deferential *Strickland* test in a way that every fair minded jurist would agree was incorrect. *Id*.

Courts analyze counsel's performance for "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. The Supreme Court shuns

specific guidelines for measuring deficient performance, as "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel, or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id*. at 688-89. Instead, courts must be highly deferential when reviewing counsel's performance, and the petitioner must overcome the presumption that the "challenged action[s] might be considered sound trial strategy." *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)) (internal quotation marks omitted).

If a petitioner can show deficient performance, he must then also show prejudice by establishing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. In Oklahoma, where the jury can only impose a death sentence unanimously, the question is whether there exists a reasonable possibility "that at least one juror would have struck a different balance but for counsel's putative misconduct." *Wackerly v. Workman*, 580 F.3d 1171, 1176 (10th Cir. 2009) (quoting *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)) (internal quotation marks omitted). When evaluating omitted information, courts consider both the benefits and the negative effects of that information. *Id*. at 1178.

### 4. *Analysis.*

The OCCA found that neither trial counsel nor appellate counsel rendered deficient performance. This decision was not contrary to clearly established federal law, nor is it an unreasonable application thereof.

#### a. *Failure to properly impeach Randall Byus.*

Petitioner complains first about trial counsel's handling of Randall Byus, who provided the only eyewitness account of the murders. Petitioner argues that

counsel did not properly impeach Byus and did not use expert testimony to emphasize the contradictions between Byus' testimony and the physical evidence. Petitioner specifically notes inconsistencies regarding DNA evidence, the number of shots fired from the SKS rifle, and the size of the magazine in the SKS rifle.

"Counsel's decisions regarding how best to cross-examine witnesses presumptively arise from sound trial strategy." *Richie v. Mullin*, 417 F.3d 1117, 1124 (10th Cir. 2005). Courts must analyze the attorney's performance without the distorting effects of hindsight. *Strickland*, 466 U.S. at 689.

Petitioner points out that while Byus only admitted to loading ammunition into the SKS rifle, the state's DNA expert could not exclude Byus as a possible match to DNA discovered on a shell casing ejected from the MAK-90 rifle. Petition at 15. Petitioner argues that trial counsel should have showcased the contradiction between Byus' testimony and the physical evidence by admitting ballistics and forensics reports or calling an expert witness. *Id*. at 17-18.

The OCCA rejected this claim, finding that trial counsel attacked Byus' credibility on cross examination, and highlighted the inconsistencies between Byus' testimony and the physical evidence. *Postelle*, No. PCD-2009-94 slip op. at 10. The OCCA also noted that counsel "spent much of closing argument" exposing the contradictions. *Id*. The OCCA's resolution of that claim is not unreasonable.

The State's forensics investigator testified about her DNA testing, and told the jury that she was able to develop a partial DNA profile from a shell casing labeled 24A. Trial Tr. vol. VII, 1871-72. The investigator testified that Byus could not be excluded as a match for that DNA profile. *Id.* The investigator also gave the jury the statistical probability that the DNA came from a random individual as opposed to Byus, a probability that was quite low. *Id*. at 1872. Petitioner's counsel confirmed that testimony on cross-examination and

emphasized that while Byus was a possible match to the DNA profile, Petitioner was not. *Id.* at 1880. The State's firearm expert, using various charts and diagrams, testified that casing 24A was ejected from the MAK-90.[1] In closing, trial counsel pointed out the discrepancy, reminding the jury that although Byus said he did not know who loaded the MAK-90 magazines, the DNA on a shell casing ejected from the MAK-90 very likely came from Byus. Trial Tr. vol. X, 2530, 2541.

Trial counsel did not need further expert testimony or reports to punctuate the inconsistency between Byus' testimony and the DNA evidence. Injecting cumulative information on that issue would have only wasted time and perhaps confused the jury. Based on the record, trial counsel's decision appears to have been sound trial strategy, and this Court cannot say that counsel's performance was deficient. And even if it were deficient, Petitioner did not suffer any prejudice. The jury heard the evidence and the argument that Byus' testimony clashed with the physical evidence. There is no reasonable probability that a juror would have deemed Petitioner innocent if the argument had been presented in a different way.

Petitioner also argues that trial counsel failed to explore Byus' statement that he saw David and Brad Postelle shoot five to six rounds total from the SKS. This testimony contradicted evidence at the crime scene that revealed at least ten casings that were ejected from a different rifle than the MAK-90, presumably the SKS.[2] Petition at 16-17. Trial counsel was not unreasonable for not cross-examining Byus on that issue. Byus admitted on direct examination that he could not say how many shots were fired at a given time, because the event happed so

---

[1] The record does not contain explicit testimony that casing 24A was ejected from the MAK-90, but the exhibits and testimony make clear, and the parties agree, that the testimony supports the fact that casing 24A was ejected from the MAK-90.

[2] Ballistics experts were not able to compare the casings to the SKS used in the murders, as that weapon was never recovered.

quickly. Trial Tr. vol. IX, 2178. Any cross-examination on the number of shots would likely only elicit another admission that he could not remember the number. Trial counsel could rightly assume that impeaching a witness on exactly how many shots originated from one of two weapons would be an exercise in futility, especially when Byus' count erred by only four or five shots.

In the context of semi-automatic weapons being fired in rapid succession, the jury could have reasonably credited Byus' testimony as surprisingly accurate, even considering the discrepancy. The Court cannot fault trial counsel for not pursuing that line of questioning. Foregoing that line of questioning also did not cause prejudice. There is no reasonable probability that exposing the slight inconsistency in front of the jury would persuade a juror reach a different verdict.

Petitioner finally claims that trial counsel should have impeached Byus based on his statement that the SKS rifle contained a five-round magazine.[3] Petitioner argues that at least ten casings related to the SKS were recovered at the scene, and that a post-conviction firearms expert was unaware of any SKS magazine that held less than ten rounds. Petition at 17. Counsel's decision to not impeach Byus on that point was not unreasonable. A police investigator already testified that the standard SKS magazine held ten rounds. Trial Tr. vol. V, 1280. Any expert testimony would have simply parroted the investigator's testimony, meaning that the testimony would yield little or no net benefit in comparison with the multiple other avenues to impeach Byus. And trial counsel did impeach Byus based on other inconsistencies between his testimony and other witness testimony, as well as on the fact that Byus testified in order to avoid the death penalty.

---

[3] Petitioner refers to a "clip" in his briefing. This is likely due to confusion in the record. An investigator for the State testified that a "stripper clip" is used to quickly load rounds into the SKS magazine. Trial Tr. vol. V, 1280. During his testimony, Byus used the term "clip" at times when he likely meant "magazine." Trial Tr. vol. VIII, 2037, vol. IX, 2152. The difference in terminology is not dispositive on this issue, and the Court will refer to a "magazine" instead of a "clip" for accuracy's sake.

Counsel's decision not to press Byus about the size of the magazine was not unreasonable, nor did it amount to deficient performance.

Also, there is no reasonable possibility that extensive impeachment on the magazine size would have altered the verdict. The jury heard from investigators that ten casings attributed to the SKS were found at the crime scene. Trial Tr. vol. VII, 1827-29. Yet Byus did not testify to seeing or hearing anyone reload the SKS. The jury also heard from an investigator that an SKS magazine would hold ten rounds. Trial Tr. vol. V, 1280. The jury heard the information it needed to conclude that Byus' testimony again did not mesh with the physical evidence; therefore there is no reasonable probability that a juror would be swayed by another expert testifying to the standard SKS magazine size.

Having examined the record, Petitioner's complaints regarding counsel's handling of Byus amount to hindsight-based criticisms against which *Strickland* warns. The OCCA's decision on this issue was reasonable, therefore this Court will not disturb that ruling.

b. *Mental retardation.*

Petitioner raises two distinct challenges to how trial counsel handled evidence of mental retardation. First, Petitioner claims that counsel should have argued mental retardation as a complete defense to the death sentence under *Atkins v. Virginia*. Second, Petitioner says that counsel should have used evidence of mental retardation as mitigating evidence. The OCCA denied this claim, stating that counsel was not ineffective because Oklahoma law excluded Petitioner from being considered mentally retarded. *Postelle*, No. PCD-2009-94, slip op. at 12-13. The OCCA addressed the Flynn Effect, and reiterated that it was irrelevant in the mental retardation determination in Oklahoma. *Id*. at 12. That decision was not unreasonable in light of clearly established federal law.

At trial, Petitioner's expert Dr. Ruwe testified regarding Petitioner's IQ tests. Petitioner scored a 76 and a 79 on the two separate tests. Trial Tr. vol. XI, 2860-61, 2876. In Oklahoma, a score of 70 or below is necessary to support a mental retardation defense. OKLA. STAT. tit. 21, § 701.10b(C). That score takes into account the standard error measurement. *Id*. However, no defendant that receives a score of 76 or above can be considered mentally retarded, and is not entitled to proceedings to determine whether he is mentally retarded. *Id*. Although Petitioner's scores are outside the range for mental retardation under Oklahoma law, he nevertheless claims that his score should be adjusted downward based on the Flynn Effect.

The Flynn Effect is "a phenomenon named for James R. Flynn, who discovered that the population's mean IQ score rises over time . . . ." *Hooks v. Workman*, 689 F.3d 1148, 1169 (10th Cir. 2012). The premise is that current IQ scores are inflated, and therefore must be renormed to take the rising IQ levels into account. *Id*. Petitioner claims that trial counsel should have used the Flynn Effect to establish that Petitioner is mentally retarded, then presented that information as both an absolute defense to his death sentence and as mitigating evidence.

Counsel was not ineffective for not advancing that argument. There is no basis for an argument that Petitioner is ineligible for the death penalty because he is mentally retarded. Petitioner's expert witness specifically testified that he was not mentally retarded. Trial Tr. vol. XI, 2862-63. Petitioner did not present a solitary piece of evidence in his post-conviction proceeding or in this proceeding that contradicts that expert opinion. Petitioner only offers his own calculations based on the Flynn Effect. While Petitioner criticizes trial counsel for not investigating further or getting a second opinion, Petitioner fails to show that any expert would actually agree with his argument. Also, the OCCA has rejected the

Flynn Effect as not relevant to the mental retardation determination. *Smith v. Oklahoma*, 245 P.3d 1233, 1237 n.6 (Okla. Crim. App. 2010). According to the Tenth Circuit, that decision is "not contrary to or an unreasonable application of clearly established federal law." *Smith v. Duckworth*, ___ F.3d ___, 2016 WL 3163056 at *8 (10th Cir. June 6, 2016). The established state and federal precedents show that Petitioner's Flynn Effect argument is not meritorious under Oklahoma law, nor is it meritorious in habeas proceedings. Counsel's performance was not deficient for not advancing an argument that was sure to fail.

The issue of whether counsel should have raised mental retardation in mitigation is more complicated. Evidence of mental retardation can be mitigating. *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004). And a failure to present mitigating evidence can rise to ineffectiveness of counsel. *See Porter v. McCollum*, 558 U.S. 30, 39-41 (2009). But counsel faced special circumstances here.

First, as noted above, Petitioner's own expert witness testified that he was not mentally retarded. Counsel would have had to impeach their own expert, Dr. Ruwe, in order to argue that Petitioner was mentally retarded. With the amount of helpful mitigating testimony which Dr. Ruwe gave, counsel would likely want to avoid damaging his credibility or expertise.

Second, it is doubtful that the trial court would have even allowed counsel to tell the jury that Petitioner was mentally retarded, even under his novel scientific theory, when Oklahoma law specifically states Petitioner *cannot* be considered mentally retarded because he scored 76 and 79 on his IQ tests. *See* OKLA. STAT.

tit. § 701.10b(C).[4]  Oklahoma's evidence rules apply in full force at the penalty stage, and it is unlikely that the trial court would admit evidence that the OCCA has deemed "not a relevant consideration in the mental retardation determination for capital defendants." *Smith*, 245 P.3d at 1237 n.6.  Further, the Flynn Effect itself is not a widely accepted theory, at least not in the capital murder context. *See Hooks*, 689 F.3d at 1170 (recognizing lack of scientific consensus on the Flynn Effect's validity). *See also Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 637-38 (11th Cir. 2016) (materials do not show a general consensus in the medical community about the Flynn Effect, and do not give any guidance as to how to apply it); *Pruitt v. Neal*, 788 F.3d 248, 267 n.2 (7th Cir. 2015) ("application of the Flynn Effect was contentious in the professional community"); *McManus v. Neal*, 779 F.3d 634, 653 (7th Cir. 2015) ("it is not common practice to adjust IQ scores by a specific amount to account for" the Flynn Effect); *Maldonado v. Thaler*, 625 F.3d 229, 238 (5th Cir. 2010) (the Fifth Circuit has not recognized the Flynn Effect as scientifically valid).  Some jurisdictions do consider and apply the Flynn Effect, but considering Oklahoma's past treatment of the theory and the federal circuit courts' critical opinion of the

---

[4] The Court is also unsure whether Petitioner could have presented the evidence as a procedural matter.  When a capital defendant seeks to raise a mental retardation defense in Oklahoma, the question can either be resolved by the trial court in a pretrial evidentiary hearing, or by the jury, during the sentencing stage of the defendant's trial. OKLA. STAT. tit. 21, § 701.10b(E)-(F).  If the defendant opts for the jury to decide the issue, the trial court submits a special issue to the jury as to whether the defendant is mentally retarded. *Id.* § 701.10b(F)  If the jury either finds that the defendant is not mentally retarded, or is unable to reach a unanimous decision on that issue, the jury can still consider the evidence presented on the mental retardation issue as a mitigating factor. OKLA. STAT. tit. 21, § 701.10b(G).  But those procedures only apply to defendants who score below a 76 on their IQ test. *Id.* § 701.10b(C).  If a defendant scores 76 or above, he is not entitled to an evidentiary hearing or a decision by the jury. *Id.*  It is unclear whether the defendant can even claim mental retardation in trial if his score is above 76.  That is not to say that this statute precludes that type of mitigating evidence, but rather to show that trial counsel was not unreasonable for not presenting evidence that would likely have been disallowed.

Flynn Effect, there is little reason to think that Flynn Effect evidence would have even been admissible at Petitioner's trial.

Third, a discussion of the Flynn Effect could have confused the jury. Counsel had a significant amount of family history, mental issues, and other mitigating evidence to present. Explaining to the jury that the Petitioner was mentally retarded, even though the law and his own expert said he was not, could have created a risk of significant confusion and might have obfuscated the other mitigating evidence. Finally, the Supreme Court acknowledged in *Atkins v. Virginia* that mental retardation can carry both positive and negative elements. 536 U.S. 304, 321 (2002). Mental retardation can "be a two-edged sword that may enhance the likelihood that the aggravating factor of future dangerousness will be found by the jury." *Id.* It would certainly be reasonable for counsel to avoid the pitfalls and obstacles that awaited any attempt to use mental retardation as a mitigating factor.

Even if counsel did not perform reasonably, there is no reasonable probability that a juror would be swayed from the death sentence by the evidence of the Flynn Effect, and therefore no prejudice. The jury heard testimony that Petitioner's IQ level sat in the borderline range for mental retardation. Dr. Ruwe explained that Petitioner functioned on a level lower that 95% of the population. Trial Tr. vol. XI, 2862. The mitigation case included evidence of Petitioner's adolescent methamphetamine abuse and the negative effects flowing from that abuse. It is unlikely that additional testimony that Petitioner's actual IQ was a few points lower--based on a sharply contested scientific theory--would persuade a juror to vote against the death penalty. The OCCA's decision is not unreasonable in light of clearly established federal law, therefore relief is denied on that issue.

### c. *Failure to present additional testimony from friends and family.*

Petitioner also claims that trial counsel failed to investigate and present other mitigating evidence. Petitioner faults the manner in which counsel presented mitigating evidence about his background, arguing that the information was incomplete and "presented in a disjointed manner." Petition at 27. Petitioner alleges that counsel also should have presented more testimony, like the affidavits attached to his state post-conviction application. *Id*. at 28-29.

Petitioner first takes issue with trial counsel's decision to present Destainy Postelle's testimony through a transcript of her testimony from David Postelle's trial. Destainy is Petitioner's sister, and was incarcerated in a juvenile facility during Petitioner's trial. Trial Tr. vol. XI, 2806. Trial counsel did obtain video testimony from Destainy, but the quality was so poor that counsel could not hear what she was saying. *Id*. at 2807. Petitioner argues that while Destainy gave emotional and persuasive testimony during David Postelle's trial, his attorneys simply presented the same testimony through a transcript at Petitioner's trial, devoid of the same emotional impact. The OCCA denied relief on this issue, finding that the record showed that presenting live testimony from those witnesses was not an option, and "beyond the control of trial counsel." *Postelle*, No. PCD-2009-94 at 14.

The OCCA's ruling was not unreasonable. Both parties stipulated that Destainy could not testify because she was incarcerated at a juvenile facility in Arizona. Petitioner has not argued that trial counsel could or should have attempted to bring her to Oklahoma. And while counsel did obtain a video of her testimony, they could not use it due to the poor quality. Faced with this difficult situation, trial counsel presented the transcript. To be sure, that option is not ideal,

but it was the best available to counsel. Counsel is not ineffective or unreasonable when they must present weak evidence through no fault of their own. Attorneys are required to act reasonably, not miraculously.

The same is true with the testimony of Gilbert Eugene Postelle Jr., Petitioner's uncle. Counsel also presented Gilbert Postelle's testimony through transcript, because he was unavailable due to medical reasons. *Id.* at 2694-95. And although counsel did not seek to obtain video testimony from Gilbert Postelle, the Court observes an obvious strategic reason: Gilbert Postelle's mental capabilities threatened his usefulness as a witness. Gilbert Postelle details how he had visions of spirit guides that drove him to attempt suicide in 2008, the year of Petitioner's trial. Original Appl. for Post-Conviction Relief, Ex. 14. Counsel investigated the possibility of Gilbert Postelle testifying, and learned that his medical status precluded his travel. Counsel likely learned the extent of those medical issues, and decided to use the transcripts of Gilbert Postelle's testimony in David Postelle's trial. That decision was reasonable given the circumstances, and thus the OCCA's resolution of that issue was also reasonable.

Petitioner refers to several affidavits containing various sorts of information, and argues that counsel should have called those witnesses and presented that testimony.[5] The affidavits generally show that Petitioner struggled in school, was a slow learner, became easily frustrated, was accident prone, and had once

---

[5] Petitioner presented these affidavits in his state post-conviction proceeding, but did not actually explain how their contents would affect his mitigation case. Original Appl. for Post-Conviction Relief at 13. The OCCA interpreted the affidavits as evidence of Petitioner's mental illnesses. *Postelle*, No. PCD-2009-94, slip op. at 14-15. In this habeas proceeding, Petitioner seems to raise the claim separate and apart from his mental health claims. Although it is unclear whether the OCCA addressed this specific claim on the merits, the Court finds that it would fail regardless of whether the standard of review were *de novo* or the deferential AEDPA standard.

encouraged a suicidal friend. Many of the affidavits discussed his family's history of mental illness, focusing especially on his mother's severe issues.

Aside from the history of mental illness, this information has relatively slight potential for beneficial impact.[6] While mitigating, the information pales in comparison to the evidence that was presented. Counsel introduced compelling evidence of a young boy who was abused by his mother and raised by his grandparents. Trial Tr. vol. XI, 2742, 2744-47. Witnesses testified that Petitioner abused methamphetamine beginning at age 12 or 13, and even helped his father cook methamphetamine in the backyard. *Id*. at 2716, 2698, 2751-54. Witnesses discussed the tragic circumstances of Petitioner's grandfather's stroke and his father's debilitating motorcycle accident. *Id*. at 2700-01, 2736-37, 2748-50, 2785-86.

Counsel painted a vivid picture of the complete and utter dysfunction surrounding Petitioner. Counsel was not unreasonable for not calling other witnesses that would have provided only marginal benefit to the mitigation case. The mental illness history of the Postelle family would be relevant, but both

---

[6] Although this point is not determinative, it is worth noting that there is good reason for caution when a habeas petitioner seeks relief on the basis of trial counsel's failure to call one or more witnesses to give testimony that the petitioner asserts would have been favorable. When a petitioner makes that kind of an argument, he can tout the beneficial import of the testimony of the witnesses who were not called while disregarding that fact that *every* decision by trial counsel as to whether to call, or not call, a given witness is, of necessity, a cost/benefit analysis (as to those aspects of the prospective witness's testimony that are knowable) and a risk analysis (as to those aspects that are not known or knowable). In this case, Petitioner complains of his trial counsel's failure to call several "family members and lifelong friends." Petition, at 28. Family members and associates of capital murder defendants are, almost by definition, risky witnesses. The marginal benefit to be derived from testimony elicited by defense counsel might be obliterated, and then some, in the blink of an eye on cross examination by a skilled and well-prepared prosecutor who knows "the rest of the story." Especially in the emotion-laden setting of the penalty phase of a capital murder trial, defense counsel must be as wary of calling one too many witnesses as he is of asking one too many questions. In the habeas context, caution is especially appropriate because the petitioner's affidavits from uncalled witnesses will quite understandably show the upside but not the downside.

Petitioner's aunt and sister already testified that Petitioner's mother suffered from mental illness to such an extent that she was committed to a mental institution. Ct.'s Ex. 13 at 2762; Trial Tr. vol. XI, 2833. While the affidavits may give more detail about Petitioner's mother's issues, the Court cannot say that counsel was unreasonable for not presenting that information, especially since Petitioner left his mother's care at a very young age. Additional lay testimony about the family's history was unnecessary. Counsel's performance was not deficient.

Even if counsel's performance was deficient regarding the additional mitigating evidence, the Court can find no prejudice. As noted above, counsel presented a complete and persuasive mitigation case, detailing Petitioner's troubled upbringing in a shameful environment. It is unlikely that a little more testimony about his struggles with school, or one more account of his mother's mental illness would tip the scale in his favor.[7] The OCCA found that counsel's performance was not deficient, and that Petitioner did not suffer any prejudice from the alleged deficient performance. Applying the high deference under both *Strickland* and AEDPA, this Court concludes that the OCCA's decision was reasonable.

> d. *Failure to present mental health evidence.*

Petitioner's final trial counsel claim involves counsel's decision to focus on Petitioner's brain damage, rather than on potential mental illnesses. Dr. Ruwe testified that Petitioner suffered from neurocognitive and psychological problems. Trial Tr. vol. XI, 2849. Petitioner claims that trial counsel focused primarily on the neurocognitive issues, particularly the organic brain damage related to

---

[7] Petitioner argues that he can show prejudice because David Postelle only received a life sentence, not the death penalty. This argument ignores the fact that Randall Byus did not testify during David's trial, therefore his jury had no eyewitness testimony to identify the most culpable party. In Petitioner's case, the jury not only heard Byus' testimony, but heard that Petitioner was the main shooter, solely responsible for killing three of the four victims.

methamphetamine use.  Petition at 31.  Petitioner argues that Dr. Ruwe also diagnosed him with Major Depressive Disorder, Recurrent, Severe, with Psychotic Features, and found that Petitioner exhibited symptoms of Posttraumatic Stress Disorder and possibly Schizoaffective Disorder or Schizophrenia, but that counsel did not focus on those issues at trial.  *Id.*

Doubtless, evidence of mental illnesses is mitigating.  *Hooks*, 689 F.3d at 1204-05.  But the Tenth Circuit has specifically identified "organic brain damage" as having a "powerful mitigating effect."  *Id.* at 1205.  To be sure, there is some overlap of the two, as organic brain damage is often the root cause of mental illnesses. *See Wilson v. Sirmons*, 536 F.3d 1064, 1094 (10th Cir. 2008).

Counsel had evidence from Dr. Ruwe that Petitioner suffered from both organic brain damage and mental illnesses.  The decision to focus Dr. Ruwe on the organic brain damage as opposed to the mental illnesses was an informed choice, based on Dr. Ruwe's findings.  At trial, Dr. Ruwe went into great detail regarding the effects of methamphetamine on Petitioner, and emphasized the problems the abuse would cause since Petitioner was very young.  Trial Tr. vol. XI, 2854-59. Dr. Ruwe's testimony gave the jury substantial information on Petitioner's cognitive short-comings and how those might affect his behavior.  Dr. Ruwe testified that his testing did not reveal any thought disorders, hallucinations, or delusions.  *Id.* at 2884.

The OCCA found that counsel's decision to focus on organic brain damage as opposed to mental illness was reasonable.[8]  This Court cannot say that the OCCA's ruling is itself unreasonable.  The fact that different trial lawyers might

---

[8]  There is little doubt, given recent trends in capital habeas litigation (at least in the Tenth Circuit), that any failure to defend on the basis of organic brain damage would result in a vigorous complaint in post-conviction proceedings. *See, generally,* the discussion in *Hooks*, 689 F.3d at 1205.

have pursued differing strategies does not make the decisions made by Petitioner's trial counsel constitutionally deficient.

Moreover, even if the performance were deficient, the OCCA reasonably concluded that the Petitioner successfully made the point that his judgment was impaired, therefore he suffered no prejudice. Dr. Ruwe's testimony explained in great detail the neurocognitive effects of drug abuse on Petitioner's brain, and discussed the depression, borderline IQ, and other psychological problems. This Court cannot say that the OCCA's determination of no prejudice is unreasonable. Relief is denied on this issue.

e. *Ineffectiveness of appellate counsel.*

Petitioner finally claims that his appellate counsel was ineffective for not raising his trial counsel claims or his mental retardation claim on direct appeal. Petition at 33-36. As discussed above, Petitioner's trial counsel claims lack merit. Therefore, appellate counsel's failure to raise those meritless claims cannot amount to deficient performance. Also, Petitioner does not show any prejudice. Appellate counsel can only be ineffective if, absent the appellate counsel's deficient performance, there is a reasonable probability that the petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). The OCCA rejected Petitioner's trial counsel and mental retardation claims as meritless. It is unlikely that Petitioner would have prevailed if appellate counsel had raised those exact claims on direct appeal. In any event, the OCCA's rejection of Petitioner's appellate counsel claims was reasonable in the light of clearly existing state law. Therefore, relief is denied as to that issue.

## 5. *Conclusion.*

The OCCA's decisions on Petitioner's ineffectiveness claims are reasonable in the light of clearly established federal law. As for Petitioner's unexhausted claim, it would be procedurally barred should Petitioner raise it in state court at this time. Therefore, Petitioner's Ground One is denied in all respects.

## B. Ground Two: Right to an Impartial Jury.

Petitioner claims that his *voir dire* process violated his right to an impartial jury. Petitioner notes that the trial court did not allow juror questionnaires or individual *voir dire*, and dismissed eight prospective jurors on its own initiative without allowing the defense to question them. Petition at 38-39. The OCCA denied these claims on direct appeal.[9] *Postelle*, 267 P.3d at 133-36.

### 1. *Clearly established law.*

Criminal defendants have "the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment . . . ." *Uttecht v. Brown*, 551 U.S. 1, 9 (2007). That right "prohibits the exclusion of venire members 'simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.'" *Wilson*, 536 F.3d at 1097 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968)). Instead, a juror is only removable for cause when his views "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt*, 469 U.S. 412, 424 (1985).

---

[9] Petitioner claims that the OCCA did not rely on federal law to decide these claims, and argues that the Court's review should be *de novo*. The OCCA very clearly referred to the standard in *Wainwright v. Witt*, 469 U.S. 412 (1985), in determining this issue, therefore the OCCA's decision is entitled to AEDPA deference. *Postelle*, 267 P.3d at 135.

The guarantee of an impartial jury requires "an adequate *voir dire* to identify unqualified jurors." *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). There is no catechism for *voir dire*, and the method is generally left to the trial court's sound discretion. *Id*. This gives the trial court "great flexibility in conducting *voir dire*." *Wilson*, 536 F.3d at 1097. But that discretion is still subject to the essential demand of fairness. *Morgan*, 504 U.S. at 730. Therefore, the Court does not ask whether further questioning or different methods would have been helpful, but whether the trial court's handling of *voir dire* "render[ed] the [Petitioner's] trial fundamentally unfair." *Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991).

## 2. *Analysis.*

It is unclear whether Petitioner raises claims based on the trial court's decision not to conduct individual *voir dire* or use juror questionnaires. The structure of the petition seems to only use those issues as background context. The Court addresses those issues nonetheless.

### a. *Individual voir dire.*

"There is no absolute right to individual *voir dire* in capital cases…." *Wilson*, 536 F.3d at 1098. Conducting *voir dire* with the entire venire present can quite easily comport with the requirements of due process. *Id*. Still, it is possible that such a method could be so egregious in certain circumstances that it would deprive a defendant of a fair trial. *Id*. These egregious situations could arise where jurors gave their opinions about guilt or innocence based on pre-trial publicity, or where jurors expressed knowledge that the defendant was arrested for some other heinous crime. *Id*. Those types of statements, made in the presence of other jurors, could taint the entire venire and render the trial fundamentally unfair. *Id*.

Petitioner does not present that type of egregious situation here. Some prospective jurors indicated that they or someone they knew had made up their minds as to guilt or innocence, but none of them gave any indication as to which verdict they favored. And while other jurors discussed their exposure to media coverage of the murders, the comments were non-specific and general. Nothing in the record indicates the kind of egregious situation where general *voir dire* tainted the entire venire or that jurors failed to answer questions fully or honestly due to *voir dire* method. The OCCA's rejection of that claim was not unreasonable.

b. *Jury questionnaires.*

The decision to use – or not use – jury questionnaires is another issue committed to the trial court's discretion. Petitioner does not make any attempt show that the *voir dire* method violated due process. As the OCCA noted, Petitioner does not identify any question that he would have asked in a questionnaire that was not or could not have been asked during *voir dire*. Petitioner does not present any argument to this Court that would indicate that the lack of a questionnaire violated his right to an impartial jury. The OCCA's decision on that point was therefore reasonable.

c. *Removal of jurors.*

Petitioner focuses primarily on the trial court's dismissal of eight prospective jurors. After asking these eight prospective jurors questions regarding their view of the death penalty and their ability to consider the possible penalties, the trial court dismissed them without allowing questioning by either party. Petitioner claims *voir dire* was inadequate because his attorneys were not permitted to question the prospective jurors prior to their dismissal. Petition at 39.

The trial court determines juror impartiality, and those determinations are findings of fact. *Patton v. Yount*, 467 U.S. 1025, 1036 (1984). The trial court also evaluates prospective jurors' demeanor and credibility, which are important considerations apart from the cold record of questions and answers. *See Uttecht*, 551 U.S. at 7-8. When faced with ambiguity in a prospective juror's statements, the trial court is free to resolve that ambiguity in favor of the State. *Id*. at 7. Reviewing courts therefore owe deference to a trial court's decision to excuse or not excuse a juror for cause. *Id*. This deference is added to the already "independent, high standard" for habeas review under the AEDPA. *Eizember v. Trammell*, 803 F.3d 1129, 1135-36 (10th Cir. 2015).

The pertinent question is whether the *voir dire* was adequate to determine whether a prospective juror was qualified to serve on the panel. *Moore v. Gibson*, 195 F.3d 1152, 1170 (10th Cir. 1999). Questioning by the parties is not constitutionally required, and there is no constitutional right to rehabilitate a prospective juror who appears unqualified. *Id*.; *Brown v. Sirmons*, 515 F.3d 1072, 1081 (10th Cir. 2008). While such questioning can sometimes be helpful and in some cases even vital, that is not the situation here.

In this case, the trial court questioned each prospective juror about his or her views on the death penalty and his or her ability to consider the punishments available. The first dismissed prospective juror, Mr. Goldsmith, responded "No" when the trial court asked if he could consider all three of the legal punishments. Trial Tr. vol. I, 37. When the trial court asked if his reservations about the death penalty were so strong that he would not consider it, regardless of the law, facts,

and circumstances of the case, Mr. Goldsmith said, "I would have to say yes." *Id*. 38. The trial court then dismissed Mr. Goldsmith.[10]

Later, the trial court questioned Mr. Murray, who initially admitted that he "could not guarantee [the court] that [he] could impose the death penalty." *Id*. at 45. The trial court then asked

> . . . if you find the defendant guilty of murder in the first degree, can you consider all three of the legal punishments, death, imprisonment for life without parole, or imprisonment for life and weigh the aggravating circumstances against the mitigating circumstances to impose the punishment that you feel is warranted by the law and evidence?

*Id*. at 45-46. Mr. Murray responded "No." The court then asked

> . . . if you find beyond a reasonable doubt that the defendant was guilty of murder in the first degree and, if under the evidence, facts and circumstances of the case would permit to [sic] you consider an imposition of death, are your reservations about the penalty of death so strong that regardless of the law, the facts and the circumstances of the case, you would not consider the imposition of the penalty of death?

*Id*. at 46. Mr. Murray said, "I could not consider the imposition of death." *Id*. Upon further questioning from the trial court, Mr. Murray indicated that he could impose death if he were an eyewitness, but not in any other situation. *Id*. The trial court explained that the law would never require a death penalty, and told Mr. Murray that he would have to be able to consider all three punishments, even after he found the Petitioner guilty. *Id*. at 47-49. Mr. Murray finally said that he could not consider all three punishments, and the trial court dismissed him. *Id*.

---

[10] Petitioner complained on direct appeal, as he complains here, that the trial court did not use the Oklahoma Uniform Jury Instruction questions when questioning Mr. Goldsmith. This issue has no constitutional import. The questions the trial court asked Mr. Goldsmith were not confusing or misleading, and were adequately designed to elicit a reliable response. Also, the trial court noted that Mr. Goldsmith was "emphatic" about his view. Trial Tr. vol. I, 39.

The next six dismissed prospective jurors simply answered "no" when asked if they could consider all three punishments, and "yes" when asked if their views on the death penalty would preclude them from even considering that punishment. *Id*. at 55, 64, 70, 90-91, 105-06, 121.  The record does not reveal any equivocation on the part of those eight prospective jurors that might have warranted further inquiry.  The questions went to the heart of the *Witt* standard by asking whether the prospective jurors' views would prevent or substantially impair their performance as jurors.  The clear statements that the eight prospective jurors would not consider one of the punishments certainly established cause for dismissal.  The trial court also observed and presumably weighed the demeanor of the prospective jurors.  Petitioner does not present any evidence or argument to overcome the deference due the trial court's factual determinations regarding prospective jurors.[11]  The OCCA's decision to reject this claim was not contrary to or an unreasonable application of clearly established law.  Therefore, relief is denied on Ground Two.

---

[11]   The undersigned, having (as presiding judge) empaneled a jury in a capital murder case, cannot but point out one of the awkward anomalies of jury selection in capital cases.  In follow up questioning after a prospective juror expresses a disinclination even to consider the death penalty, defense counsel will almost plead with the prospective juror to consider voting for death (or at least to profess willingness to do so).  In turn, the prosecutor will ask questions designed to shore up the candidate's unalterable moral opposition to the ultimate penalty.  (And these roles are reversed when the candidate says, as some do, that he will not consider any penalty other than death if murder is proven.)  Petitioner has cited no constitutional authority, and the Court has found none, for the proposition that a trial judge, having heard a definitive statement of unwillingness to consider one of the permissible penalties, must subject the prospective juror to a tug of war between the prosecution and the defense.  Unless the trial judge, with the benefit of first-hand observation of the prospective juror, has reason to believe that a definitive statement of position can be softened up by partisan voir dire (with the result that one party or the other has to expend a peremptory challenge that could otherwise be profitably used to get rid of some other candidate), exposing the prospective juror to verbal pushing and shoving by counsel will, in almost every instance, amount to a waste of time and an unseemly imposition on the prospective juror.

## C. Ground Three:  Exclusion of David Postelle's Sentence.

David Postelle was tried prior to Petitioner for the same murders, and received four consecutive life sentences without possibility of parole. Petition at 47. Petitioner complains that the trial court violated his right to present mitigating evidence by excluding evidence of David Postelle's life sentence. *Id*. at 47-48. On direct appeal, the OCCA denied this claim, holding that while the trial court was not precluded from admitting the evidence, the trial court did not err by excluding it. *Postelle*, 267 P.3d at 140-41.

### 1. *Clearly established law*.

Courts must allow sentencers to consider "*as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (emphasis in original). The Supreme Court has observed that the "low threshold for relevance" asks whether the evidence "tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value." *Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 440 (1990)). Yet the Supreme Court has also noted that state courts still retain their traditional authority to "exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Lockett*, 438 U.S. at 604 n.12.

### 2. *Analysis.*

Petitioner argues that David Postelle's sentence is relevant mitigating evidence under clearly established federal law. Petitioner relies heavily on *Parker v. Dugger*, 498 U.S. 308 (1991). In *Parker*, the Supreme Court found that although the Florida trial court found and weighed a co-defendant's more lenient

sentence as mitigating evidence, the state supreme court did not. *Id*. at 315-16, 318. The Supreme Court observed that the sentence was proper nonstatutory mitigating evidence under Florida law. *Id*. at 315-16. Petitioner claims that this observation clearly establishes David Postelle's sentence as relevant mitigating evidence in Petitioner's case.

This argument misconstrues *Parker*. The Supreme Court reversed the Florida Supreme Court's decision because the Florida Supreme Court stated, as a factual finding, that the trial court did not find any mitigating circumstances. *Id*. at 321-23. After a lengthy discussion, the Supreme Court concluded that the trial court had found and weighed several mitigating circumstances, including the co-defendant's sentence. *Id*. at 315-18. Based on the obvious factual disagreement between the trial court and the Florida Supreme Court, the Supreme Court determined that the Florida Supreme Court's decision rested on an unreasonable determination of facts. *Id*. at 322-23. The Supreme Court stated that "had the Florida Supreme Court conducted its own examination of the trial and sentencing hearing records and concluded that there were no mitigating circumstances, a different question would be presented." *Id*. at 322. The facts and circumstances in *Parker* show that the Supreme Court was not addressing the issue of whether a co-defendant's sentence is relevant mitigating evidence under *Lockett*. The issue merely arose because the trial court properly considered that type of evidence under Florida law.

This Court faces the "different question" referred to in *Parker*: does clearly established federal law require that a trial court admit the sentence of a co-defendant as mitigating evidence? Having discussed why *Parker* fails to address that question, the Court now considers other existing precedent on the subject.

The OCCA cited a split of authority on this issue. Notably, the only cases the OCCA found on Petitioner's side were state court cases. *Postelle*, 267 P.3d at 140-41. Three circuits, the Fourth, Fifth, and Ninth, have found that *Lockett* and its progeny do not require admission of a co-defendant's sentence. *Id.* (citing *Meyer v. Branker*, 506 F.3d 358, 375-76 (4th Cir. 2007); *Beardslee v. Woodford*, 358 F.3d 560, 579 (9th Cir. 2004); *Brogdon v. Blackburn*, 790 F.2d 1164, 1169 (5th Cir. 1986)). Research discloses no published Tenth Circuit decisions on this issue. However, the weight of federal authority appears to indicate that a trial court does not violate *Lockett* or any other clearly established federal law by excluding evidence of a co-defendant's sentence.

This conclusion is consistent with *Lockett's* direction to allow mitigating evidence about a defendant's character, record, or the circumstances of the crime. A co-defendant's sentence does not fall into any of those categories. Instead, it is an extrinsic consideration. Petitioner argues that since the evidence gives some reason to impose a sentence less than death, *Lockett* demands its inclusion. But this broad proposition ignores *Lockett's* limiting principle that the evidence must relate to the defendant or the circumstances of his crime. The Court can conceive of an abundance of facts that could give *some* reason not to impose the death penalty. But many of those facts would be completely irrelevant to the actual case that the jury must resolve. The OCCA concluded that the trial court did not err under *Lockett* by excluding evidence of David Postelle's sentence during the mitigation presentation. That decision was not contrary to or an unreasonable application of clearly established federal law. Relief is denied on Ground Three.

### D. Ground Four:  Victim Impact Testimony.

Petitioner claims that the victim impact statements read by John Alderson, brother of victim James Alderson, and Janet Wright, mother of victim Amy Wright, violated his constitutional rights.  Petitioner argues that the statements were overly emotional and contained characterizations of the crimes.  Petition at 57-59.  Petitioner also claims that victim impact testimony acted as an unconstitutional super-aggravator.  *Id*. at 55-56.  On direct appeal, the OCCA reviewed for plain error and found that the victim impact testimony was proper, did not unfairly prejudice Petitioner, and did not prevent the jury from reaching a reasoned, moral decision.  *Postelle*, 267 P.3d at 143.  The OCCA also rejected his "super-aggravator" argument, relying on state precedent.  *Id*. at 146.

#### 1. *Exhaustion*.

Petitioner's current argument on this claim is more expansive than the argument he presented on direct appeal.  There, Petitioner only complained that the victim impact testimony was overly emotional.  Br. of Appellant at 78-80.  Petitioner did not challenge the portions of the victim impact testimony that discussed the circumstances of the crime.  *Id*.  However, the OCCA's order stated that the testimony mentioned "the physical effects of the crime" and "the manner in which it was carried out…."  *Postelle*, 267 P.3d at 143.  The OCCA then ruled that the victim impact testimony was permissible.  *Id*.  As noted in Section III.A, *supra* p. 8, the purpose of exhaustion is to give state courts the first opportunity to correct alleged violations of state prisoner's federal rights.  While Petitioner did not challenge  the characterizations of the crimes, the OCCA apparently ruled on that issue.  The Court therefore finds this claim is exhausted.

## 2. *Clearly established law.*

The Supreme Court at one time prohibited testimony by a murder victim's family that "described the personal characteristics of the victims and the emotional impact of the crimes on the family," and gave "family members' opinions and characterizations of the crimes and the defendant." *Booth v. Maryland*, 482 U.S. 496, 502-03, 509 (1987). The Supreme Court later overruled *Booth* in part, and found that the first category (characteristics of the victims and the impact on the family) was admissible. *Payne v. Tennessee*, 501 U.S. 808, 830 & n.2 (1991). *Payne* did not require states to allow victim impact evidence, but rather held that

> . . . if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty may be imposed.

*Id*. at 827. Under *Payne*, prosecutors may give a "quick glimpse of the life petitioner chose to extinguish." *Id*. at 830 (O'Connor, J., concurring) (quotation omitted). Evidence of the victim and the impact on the victim's family is therefore treated as any other relevant evidence. *Id*. at 827. Any challenge to such evidence must show that it "is so unduly prejudicial that it renders the trial fundamentally unfair." *Id*. at 825.

But while *Payne* allows evidence about the victim and the victim's family, it does not permit family members to give their opinions regarding the crimes and the defendant. *Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011). Therefore, victim impact testimony that characterizes the crime itself or recommends a specific sentence is still barred under *Booth*. *United States v. McVeigh*, 153 F.3d 1166, 1217 (10th Cir. 1998) (disapproved on other grounds).

### 3. *Analysis.*

During the sentencing stage of Petitioner's trial, John Alderson read a victim impact statement. That statement discussed the emotional trauma, stress, and physical illness that James Alderson's death brought to his family. Trial Tr. vol. XI, 2654. He described James' care for their elderly mother, who was not able to view James' body because his head and face were so disfigured from the gunshot wounds. *Id*. Mr. Alderson also explained his decision to attend all of the hearings, even to the point of neglecting the family business. *Id*. at 2655.

Janet Wright also read an impact statement. She expressed the difficulty of losing a child. *Id*. at 2657. Mrs. Wright said that knowing her daughter "was chased from her home and shot in the back is an unthinkable nightmare from which my family and I will never awake." *Id*. She described her memories of Amy as a little girl, and mentioned Amy's love of animals. *Id*. at 2657-58. Mrs. Wright spoke of Amy's interests, talents, and personality. *Id*. at 2658. Mrs. Wright told how Amy's death affected her family. Mrs. Wright detailed her own struggle to work and be ambitious in her career, her increased fear for her safety, and her need for counselling, anti-anxiety medications, and sleeping pills. *Id*. at 2658-59. She testified that Amy's sister lost her job, moved back in with her parents, gave up on a singing competition, and changed her major in college. *Id*. at 2658-59. Mrs. Wright concluded by noting that while one of the people who took her daughter's life was allowed to go home to family, she could only go to a cemetery. *Id*. at 2659-60.[12] Petitioner claims that these statements were unduly emotional and improperly characterized the crimes at issue.

---

[12] While the transcript is unclear, this comment likely refers to Petitioner's father, Brad Postelle, who was deemed incompetent and released to his home.

a. *Emotional content.*

The OCCA considered the emotional content of these two victim impact statements, and determined that the evidence was "concise, and narrowly focused on the permissible subjects and was within the bounds of admissible victim impact testimony." *Postelle*, 267 P.3d at 143. On that issue, the OCCA's decision was not unreasonable.[13]

Not only is testimony about the victim and the victim's family permissible, but the Tenth Circuit has frequently held that even highly emotional victim evidence did not render trials unfair. Two cases in particular illustrate this trend. In *United States v. Chanthadara*, a defendant claimed error when the trial court allowed the murdered woman's husband and two children to present victim impact testimony. 230 F.3d 1237, 1274 (10th Cir. 2000). The husband showed the jury numerous color photographs of his wife. *Id*. The children were ages seven and ten, and both "ended their testimony in tears." *Id*. The jury even took letters from the children to their dead mother into the jury room, as well as a "daily journal which described one child's loss." *Id*. Despite the heart-wrenching emotional content of that evidence, the Tenth Circuit determined that it was not "so prejudicial as to render the proceeding fundamentally unfair." *Id*.

The Tenth Circuit reached the same conclusion in *United States v. McVeigh*, where the trial court allowed extensive victim impact evidence regarding the Murrah Building bombing. 153 F.3d at 1218-19. That evidence included witness

---

[13] To the extent that Petitioner argues that the OCCA's decision is not entitled to deference, the Court notes that the case cited by the OCCA in its disposition of this claim, *Murphy v. Oklahoma*, discusses *Payne* and *Booth* at length. 47 P.3d 876, 885 (Okla. Crim. App. 2011). The Court is required to give state-court decisions the benefit of the doubt, and presume that state courts know and follow the law. *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). The Court is satisfied that the state court applied the federal standard, therefore its ruling on this point is entitled to AEDPA deference.

accounts of their last contact with the victims, "agonizing efforts to find out what happened to their loved ones," their emotional reactions to learning of their loved ones' deaths, the professional and personal histories of the victims, including their admirable qualities, the innocence and unconditional love of the murdered children, and the tragic on-going impact on the victims' families. *Id.* at 1219-21. Yet the Tenth Circuit found that this substantial broadside of emotionally-charged evidence did not render the defendant's trial fundamentally unfair. *Id.* at 1222.

The victim impact evidence in Petitioner's trial pales in comparison to the evidence in *Chanthadara* and *McVeigh*. Mr. Alderson's testimony was emotional, but not so much that it rendered Petitioner's trial unfair. Instead, the testimony focused on the impact that James Alderson's death had on the family, and offered a short glimpse at his life. Janet Wright's testimony was also emotional, and poignantly described her struggle with her daughter's murder. The Supreme Court has allowed this type of evidence to give the victims a voice, and portray them as "a unique loss to society and in particular to [their] famil[ies]," not a "faceless stranger at the penalty phase of a capital trial." *Payne*, 501 U.S. at 825 (quotations omitted). The evidence in this case accomplished that permissible purpose. The Court is confident that the evidence at issue in this case was not so emotional as to violate Petitioner's due process right to a fair trial. Therefore, the OCCA reasonably denied Petitioner's claim that the victim impact testimony was unconstitutional because of its emotionally-charged nature.

    b. *Characterization of the crime*.

Petitioner also argues that certain portions of the victim impact statements included characterizations of the murders. John Alderson described James Alderson's disfigured head and face in the context of explaining why his mother

could not say a final goodbye. Trial Tr. vol. XI, 2654. Janet Wright discussed the "nightmare" of knowing that her child was chased from her home and shot in the back, and said that the crime was "without apparent reason." *Id*. at 2657.

These statements are not purely evidence about the victims and the impact on the victims' families. They instead stray into the realm of characterizing the crimes at issue, which *Booth* precludes. The OCCA recognized that the evidence was "clearly related to the physical effects of the crime" and "the manner in which it was carried out . . . ." *Postelle*, 267 P.3d at 143. But the OCCA held that under Oklahoma law, such evidence was permissible. That decision was in error, as it is contrary to the clearly established law set out in *Booth*. Having found error, the Court must now consider whether the error was harmless.

c. *Harmless Error*.

When state courts do not address an error, federal habeas courts must determine if the error "had substantial and injurious effect or influence in determining the jury's verdict." *Fry v. Pliler*, 551 U.S. 112, 116, 121-22 (2007) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). This test lets habeas petitioners obtain plenary review, but only allows relief if the error caused "actual prejudice." *Id*. at 637. And an "error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634. To grant relief, the reviewing court must have grave doubts as to the error's effect on the verdict, and if the court is in "virtual equipoise as to the harmlessness of the error," the court should "treat the error…as it affected the verdict." *Selsor*, 644 F.3d at 1027 (quoting *Fry*, 551 U.S. at 121 n.3).

Courts determine whether an error had a substantial or injurious effect by considering the improper evidence in the context of the entire trial and the record

as a whole. *Brecht*, 507 U.S. at 638. Using the Tenth Circuit's approach, the Court will first examine the nature of the problematic statements, and then "address the broader context of mitigating and aggravating evidence presented at trial." *Lockett v. Trammel*, 711 F.3d 1218, 1238 (10th Cir. 2013).

The problematic comments are mild. Two are closely tied to appropriate victim impact testimony, specifically the impact of the deaths on the families. John Alderson discussed James' injuries only to explain why the funeral home director suggested that his mother not look at the body. Trial Tr. vol. XI, 2654. And Janet Wright spoke of her daughter being chased and shot – explaining how, as a mother, she was affected more deeply by that than she would have been if Amy had died of a natural cause. *Id*. at 2657. The Court acknowledges that these statements did cross the line into the impermissible characterization of the crime, but not by much. Also, the statements were not couched in inflammatory language but were instead matter-of-fact descriptions consistent with evidence already presented throughout the trial. Finally, as discussed above, the other portions of the statements were proper, and did not pile overly-emotional testimony atop the impermissible comments.

Not only were the statements mild, but the evidence supporting the aggravating circumstances regarding victims Alderson and Wright was significant. The prosecution presented evidence that Petitioner shot all four victims and was solely responsible for killing three of them. That evidence firmly supports the aggravating circumstance that Petitioner created a great risk of death to more than one person. Also, the evidence showed that Petitioner chased Alderson and Wright from the trailer, through the property, and shot them as they tried to escape impending death. *Postelle*, 267 P.3d at 144. The mental terror of running for their lives established that the murders were especially heinous, atrocious, and cruel.

And finally, the prosecution provided ample evidence that Petitioner posed a continuing threat to society.[14]  One witness recounted Petitioner's remorseless boast that he "shut that bitch up in the corner," and the accompanying pantomime of a rifle shot.  Trial Tr. vol. IX, 2280-81.   Another described Petitioner saying "bitch you better not say nothing" to an individual that overheard Petitioner's description of the murders.  Trial Tr. vol. VII, 1702.  Finally, the prosecution presented evidence that Petitioner crafted a 10-12 inch shank while awaiting trial in the county jail.  Trial Tr. vol. XI, 2690-91.  The callousness, threats, and contraband weapons certainly support the assertion that Petitioner would be a continuing threat.  All told, the case in aggravation against Petitioner was strong.

The mitigating evidence was also substantial, and addressed Petitioner's troubled upbringing, drug abuse, and mental health issues.  However, the prosecution presented sufficient aggravating evidence to outweigh the mitigating evidence.  And at the close of the evidence, the trial court specifically instructed the jurors on the weight they could give to the victim impact evidence and admonished the jury not to impose the death penalty as an emotional response.  O.R. VIII at 1535-36.  Considering the statements and the entire context of the trial, the Court is not in grave doubt that the three mild sentences from the victim impact statements had a substantial or injurious effect on the jury's decision.  Therefore, while the characterizations of the murders should not have been admitted into evidence, the error was harmless.

---

[14] While the jury ultimately rejected the continuing threat aggravator, the evidence certainly weighed in favor of the death penalty and therefore is relevant to this Court's harmless error analysis. *See Selsor*, 644 F.3d at 1027.

d. *Victim impact evidence as a super-aggravator*.

Petitioner also argues that victim impact testimony is a "super-aggravator." Petitioner claims that while Oklahoma law allows juries to consider victim impact testimony when deciding whether to impose the death sentence, the law does not give clear guidance as to how juries must weigh that evidence. Petition at 55-56, 63-67. The OCCA rejected the argument, as it has many times before.[15] That decision was not unreasonable.

As discussed above, the Eighth Amendment does not erect a *per se* bar to victim impact testimony. If a state wishes to include victim impact testimony in its death penalty scheme, there is no *per se* constitutional obstacle. *Payne*, 501 U.S. at 827. The State of Oklahoma has decided that victim impact testimony will be permitted. OKLA. STAT. tit. 21, §§ 701.10(C), 142A-8(A). To aid the jury in properly considering victim impact testimony, the trial court instructed the jury that victim impact testimony was not an aggravating circumstance or proof of an aggravating circumstance. O.R. VIII at 1535. The instructions further told the jury that it could only consider the victim impact testimony if it first found the presence of an aggravating circumstance. *Id*. at 1535-36.

Petitioner argues that the instructions do not guide the jury on how to use or weigh the victim impact testimony. But trial courts do not instruct the jury on how to weigh any evidence. As Petitioner points out, the jury must reach a moral reasoned judgment after considering all the evidence. Exactly how to weigh each piece of evidence is not the province of the courts or statutes, rather is the duty of the jury. Doubtless some jurors value victim impact evidence more than others,

---

[15] Petitioner again argues that the OCCA did not consider federal law in reaching its decision. The cited materials in the OCCA's decision trace back to the OCCA's discussion of *Payne* and *Booth* in *Murphy*, 47 P.3d at 886. *See* Footnote 8*, supra* p. 32.

but that does not render the scheme unconstitutional.  Notably, Petitioner's jury could also, under Jury Instruction 62, consider sympathy when deciding whether to impose the death penalty.  *Id*. at 1537.  Sympathy is certainly not a mitigator in the ordinary sense of the word, yet the jury could still consider it.  The jury's ability to consider sympathy does not render it a "super-mitigator," but merely allows the jury to consider sympathy when reaching the reasoned moral decision as to whether to impose the death penalty.  Victim impact testimony is treated the same way.  The Tenth Circuit has specifically acknowledged that Oklahoma's decision to allow victim impact testimony, when accompanied by a proper instruction, does not create a "super-aggravator."  *See Brown*, 515 at 1096-97; *Le v. Mullin*, 311 F.3d 1002, 1016 (10th Cir. 2002).  The OCCA's rejection of this claim was not unreasonable.

e. *Victim impact testimony consideration under* Ring v. Arizona.

Petitioner finally claims that victim impact testimony violates the Sixth Amendment because the jury is not required to find "whatever it must find" beyond a reasonable doubt.  Petition at 67.[16]

Petitioner's argument is precluded by Tenth Circuit precedent.  In *Matthews v. Workman*, the Tenth Circuit characterized the weighing analysis for aggravating and mitigating circumstances not as a factual finding, but rather as a "highly subjective, largely moral judgment regarding the punishment that a particular person deserves."  577 F.3d 1175, 1195 (10th Cir. 2009) (quoting *United States v. Barrett*, 496 F.3d 1079, 1107 (10th Cir. 2007)).  This Court and other district courts have emphasized that point in numerous cases.  *See Lay v. Trammell*, No.

---

[16] There is some debate between the parties as to whether this claim is exhausted.  Rather than untangle the complicated exhausted question, the Court deems it simpler to dispose of the claim on its merits.

08-CV-617-TCK-PJC, 2015 WL 5838853, at *54-56 (N.D. Okla. Oct. 7, 2015); *Rojem v. Trammell*, No. CIV-10-172-M, 2014 WL 4925512, at *18 (W.D. Okla. Sept. 30, 2014); *Smith v. Trammell*, No. CIV-09-293-D, 2014 WL 4627225, at *50 (W.D. Okla. Sept. 16, 2014); *Ryder ex rel. Ryder v. Trammell*, No. CIV-05-0024-JHP-KEW, 2013 WL 5603851, at *35 (E.D. Okla. Oct. 11, 2013); *Fitzgerald v. Trammell*, No. 03-CV-531-GKF-TLW, 2013 WL 5537387, at *59 (N.D. Okla. Oct. 7, 2013); J*ackson v. Workman*, No. 08-CV-204-JHP-FHM, 2013 WL 4521143, at *27 (N.D. Okla. Aug. 26, 2013); *Cole v. Workman*, No. 08-CV-328-CVE-PJC, 2011 WL 3862143, at *51-52 (N.D. Okla. Sept. 1, 2011); *DeRosa v. Workman*, No. CIV-05-213-JHP, 2010 WL 3894065, at *32-33 (E.D. Okla. Sept. 27, 2010); *Murphy v. Sirmons*, 497 F. Supp. 2d 1257, 1277-78 (E.D. Okla. 2007). That same logic applies here. The jury's consideration of victim impact testimony is part of that highly subjective moral judgment, and is therefore not a factual finding subject to the reasonable doubt standard. Relief is denied on this issue.

### 4. *Conclusion*.

Petitioner's claims that the victim impact evidence was overly emotional, that victim impact evidence is a super-aggravator, and that victim impact testimony is subject to the reasonable doubt standard are all without merit. The OCCA reasonably rejected those claims. However, the OCCA's decision that victim impact testimony characterizing the crimes at issue was admissible is contrary to clearly established law. Still, the Court finds this error harmless. Relief is denied as to Ground Four.

## E. Ground Five:  Mental Retardation.

Petitioner claims that his death sentence should be reversed because he is mentally retarded.  Petition at 69.  Petitioner bases this claim on his understanding that Flynn Effect would reduce his IQ score to the range in which Oklahoma considers persons mentally retarded.  *Id*.  Petitioner failed to raise this issue on direct appeal, but did raise it in his post-conviction application.  *Postelle*, No. PCD-2009-94, slip op. at 18 n.9.  The OCCA held that the claim was barred because Petitioner failed to raise it on direct appeal.  *Id*. at 17-18.

As noted above, Petitioner does not seriously contend that Oklahoma's bar is inadequate or dependent on federal law.  *Supra* pp. 11-12.  And because this claim does not involve the ineffective assistance of trial counsel, the fact that Petitioner had trial and appellate attorneys from the same office is irrelevant.  Petitioner instead attempts to show cause and prejudice for this Court to excuse the procedural default.  Petitioner argues that his appellate counsel was ineffective in not raising the claim on direct appeal, and therefore he has cause for the default.

"A meritorious claim of ineffective assistance of counsel constitutes cause and prejudice for purposes of surmounting the procedural bar."  *United States v. Harms*, 371 F.3d 1208, 1211 (10th Cir. 2004).  But a non-meritorious ineffectiveness claim does not establish cause and prejudice.  *Johnson v. Gibson*, 229 F.3d 1163, 2000 WL 1158335 at *4 (10th Cir. Aug. 16, 2000) (unpublished table opinion).  Petitioner's ineffectiveness claims falls in the latter category.  The Court has already addressed whether Petitioner's trial and appellate counsel were ineffective for not raising the Flynn Effect argument.  *Supra* pp. 18-19, 27.  The Court concluded that counsel's performance was not deficient for omitting the mental retardation claims.  The Court has ruled that the ineffectiveness claim is not

meritorious; therefore, it cannot serve as cause to excuse the default. Ground Five is denied as procedurally barred.

## V. Motions for Discovery and Evidentiary Hearing.

Petitioner has filed a motion for discovery (Doc. 20) as well as a motion for an evidentiary hearing (Doc. 30). These motions are **DENIED**. Petitioner's discovery request seeks to interview several individuals, many of whom were involved in Petitioner's trial. Doc. 20 at 3-4. Petitioner appears to be seeking information to supplement his mental retardation and ineffective assistance of counsel claims. Considering the list of individuals and the information Petitioner seeks, the Court cannot conclude that any of the discovery will affect this Court's conclusion on any of Petitioner's claims. Petitioner has not shown good cause for discovery. *See* Rule 6(a) of the Rules Governing Section 2254 Cases in the United States District Courts (requiring good cause to obtain discovery authorization).

In addition to his discovery request, Petitioner requests an evidentiary hearing with respect to Grounds Four (victim impact testimony) and Five (mental retardation). Doc. 30 at 1. "The purpose of an evidentiary hearing is to resolve conflicting evidence." *Anderson v. Attorney General of Kansas*, 425 F.3d 853, 860 (10th Cir. 2005). If there is no conflict, or if the claim can be resolved on the record before the Court, then an evidentiary hearing is unnecessary. *Id.* at 859. An evidentiary hearing is unwarranted on Grounds Four and Five to resolve the legal issues. No information gained from an evidentiary hearing would affect the legal findings on those grounds. Therefore, the requests for discovery and evidentiary hearing are denied.

## VI. Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to the requested relief. Accordingly, Petitioner's Petition (Doc. 19), motion for discovery

(Doc. 20), and motion for an evidentiary hearing (Doc. 30) are hereby **DENIED**. A judgment will enter accordingly.

      IT IS SO ORDERED this 2nd day of September, 2016.


                        STEPHEN P. FRIOT
                        UNITED STATES DISTRICT JUDGE

12-1110p022 r .docx