FILED
United States Court of Appeals
Tenth Circuit

**August 27, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

GILBERT RAY POSTELLE,

    Petitioner - Appellant,

v.

MIKE CARPENTER[*], Interim
Warden, Oklahoma State Penitentiary,

    Respondent - Appellee.

No. 16-6290

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 5:12-CV-01110-F)**

---

Robert A. Nance (John T. Carlson, Assistant Federal Public Defender, Denver
Colorado, with him on the briefs), Riggs, Abney, Neal, Turpen, Orbison & Lewis,
Oklahoma City, Oklahoma, for the Appellant.

Caroline E.J. Hunt, Assistant Attorney General (Mike Hunter, Attorney General
of Oklahoma, with her on the brief), Office of the Oklahoma Attorney General,
Oklahoma City, Oklahoma, for the Appellee.

---

Before **TYMKOVICH**, Chief Judge, **LUCERO**, and **MORITZ**, Circuit Judges.

---

**TYMKOVICH**, Chief Judge.

---

  [*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Mike
Carpenter is substituted for Terry Royal as the respondent in this case.

---

An Oklahoma jury convicted and sentenced Gilbert Ray Postelle to death in connection with the brutal killings of four people.  On Memorial Day 2005, Postelle and two other assailants attacked Donnie Swindle at his home, murdering him along with three acquaintances.  The raid apparently sprang from the Postelle family's grudge against Mr. Swindle alone; the three other victims had no connection to the feud.

After an unsuccessful appeal and collateral action in state court, Postelle now pursues federal habeas corpus relief.  He alleges the state prosecution violated several of his constitutional rights, including his Sixth Amendment right to counsel and his Eighth Amendment right against cruel and unusual punishment. Postelle raises three issues: (1) whether he received constitutionally adequate trial counsel; (2) whether he received constitutionally adequate appellate counsel; and (3) whether the unconstitutional presentation of victim-impact evidence at trial prejudiced his defense.  He also asks to expand the scope of our review to include several new issues for which he has yet to receive a Certificate of Appealability.

For the reasons given below, we affirm denial of the writ and decline to extend the scope of our review.

-2-

# I. Background

We base our description of Postelle's crimes on the Oklahoma Court of Criminal Appeals's (OCCA) account in *Postelle v. State* (*Postelle I*), 267 P.3d 114 (Okla. Crim. App. 2011), as well as the jury's findings and other uncontested facts.

The background for these crimes begins with Earl Bradford "Brad" Postelle being thrown from his motorcycle in a single-vehicle accident. *See id.* at 124 & n.7; Tr. 1030–33. Brad suffered grave injuries, both physical and mental, as a result of the crash. *See Postelle I*, 267 P.3d at 124. Without apparent basis, he and his two sons—David and Gilbert Postelle—would eventually blame the accident on an acquaintance named Donnie Swindle. *See id.* at 124–25; Tr. 2239. And on Memorial Day 2005, that blame erupted into violence.

The day began with the Postelles hosting several friends at their home in Midwest City, Oklahoma. *See Postelle I*, 267 P.3d at 123–24; Tr. 1635, 2087. The house often served as a place to use methamphetamine, and this gathering was no different. *Postelle I*, 267 P.3d at 124. On this day, however, Gilbert and David Postelle resolved that "those responsible" for their father's injuries "were 'going to pay.'" *Id.*

That afternoon, the Postelles and three friends left the house, ostensibly to go target shooting. *Id.* at 124–25. After dropping off two of the passengers,

however, their van did not follow its usual course to the riverbank. *Id.* at 125; *see* Tr. 2039, 2065. Instead, it rolled on toward the home of Donnie Swindle.

As they drove onto Swindle's property, he and a guest named Terry Smith approached the van. *Postelle I*, 267 P.3d at 125; *see* Tr. 2072. Gilbert Postelle promptly slid open the van door and shot Smith in the face with a military-style rifle. *Postelle I*, 267 P.3d at 124–25 & n.9. Gilbert and Brad then shot at Swindle, dropping him to the ground. *Id.* at 125. Next, David Postelle took Brad's gun and shot the bewildered Swindle in the head. *Id.* at 126. Gilbert then "turned and ran through [Swindle's] trailer, looking for others and firing his gun." *Id.* at 126. He came out through the back door and "chased down" a third victim, James Alderson. *Id.* Gilbert "shot [Alderson] as [he] tried to seek cover under a boat." *Id.* Gilbert then gunned down one final victim—Amy Wright—with three shots from behind. *See id.* at 123 & n.1, 126. The perpetrators then got back in the van and drove away. *Id.* at 126.

Oklahoma law enforcement eventually identified, arrested, and charged Gilbert Postelle with four counts of first-degree murder and one count of conspiracy to commit a violent felony. *See id.* at 123. In light of evidence depicting the events above, a jury convicted Postelle of all five crimes. *See id.* Then, despite mitigating evidence of "organic brain damage and mental illness," "drug abuse from an early age," and a "chaotic and abusive upbringing," *Postelle v. State* (*Postelle II*), No. PCD-2009-94, slip op. at 14 (Okla. Crim. App. filed

Feb. 14, 2012), the jury sentenced Postelle to death, *see Postelle I*, 267 P.3d at 123.

Postelle challenged his conviction and sentence in the Oklahoma courts. On direct appeal, he argued—among other claims—that the State's use of victim-impact statements during the trial's sentencing phase violated his Eighth Amendment rights. *See* Brief ex rel. Gilbert Ray Postelle, Appellant at 78–80, *Postelle I*, 267 P.3d 114 (D-2008-934). The OCCA rejected the challenge on plain error review. *See Postelle I*, 267 P.3d at 142–43. Postelle then applied for post-conviction collateral relief. This time—again, among other claims—he contended his trial and appellate counsel had rendered constitutionally inadequate assistance. *See* Original Appl. Post Conviction Relief Death Penalty Case at 5–10, 47–49, *Postelle II*, slip op., (PCD-2009-94) [hereinafter PCR Appl.]. The OCCA rejected these arguments as well, again affirming the trial court. *See Postelle II*, slip op. at 9–17, 18–20.

Finally, Postelle sought protection from the federal courts. In September 2013, he filed this action in the Western District of Oklahoma for the writ of habeas corpus. *See* R., Vol. I at 10. Postelle based his petition, in relevant part, on the alleged constitutional violations just mentioned. *See id.* at 24–51. The district court denied relief. *See id.* at 584–85. Postelle now appeals that denial.

# II. Analysis

Postelle asks us to overturn the district court with respect to three issues. *First*, he claims his trial counsel rendered ineffective assistance by not using the "Flynn Effect" as part of the mitigation strategy to help argue against a death sentence. *See* Aplt. Br. at 2. *Second*, he claims his *appellate* counsel rendered ineffective assistance by not challenging *trial* counsel's failure to use Flynn Effect evidence for death penalty–eligibility and mitigation purposes. *See id.* *Finally*, Postelle claims certain victim-impact evidence erroneously introduced in the sentencing phase was not harmless, but in fact prejudiced his defense. *See id.*

In appeals from orders denying a writ of habeas corpus, we review the district court's legal analysis de novo and its factual findings for clear error. *Smith v. Duckworth* (*Smith II*), 824 F.3d 1233, 1241–42 (10th Cir. 2016). To qualify for the writ, however, a state prisoner must carry a heavy burden. Indeed, Congress has directed federal courts to give their state counterparts deference in all but the narrowest circumstances. *See* 28 U.S.C. § 2254(d). As relevant here, under the Antiterrorism and Effective Death Penalty Act (AEDPA), a state court must contradict or unreasonably apply "clearly established Federal law, as determined by the Supreme Court of the United States" as a prerequisite to federal habeas relief. *Id.* Mindful of that threshold inquiry, we turn to Postelle's claims.[1]

---

[1] The parties have also briefed tangential matters of preservation and

(continued...)

### A.  Ineffective Assistance of Counsel

The Sixth Amendment guarantees every accused "the right . . . to have

Assistance of Counsel for his defence."  U.S. Const. amend. VI.  The Supreme

Court has interpreted this right to guarantee every criminal defendant a minimum

quality of advocacy from a professional attorney.  In *Strickland v. Washington*,

466 U.S. 668 (1984), the Court held a criminal defendant could establish a

violation of his right to counsel upon two related but distinct showings.  First, he

"must show that counsel's performance was deficient."  *Id.* at 687.  In this

context, only commission of "errors so serious that counsel was not functioning as

the 'counsel' guaranteed . . . by the Sixth Amendment" constitutes "deficient

performance."  *Id.*  "Second, the defendant must show that the deficient

performance prejudiced the defense."  *Id.*  This inquiry also looks to counsel's

errors, this time to determine whether they were "so serious as to deprive the

defendant of a fair trial" with a "reliable" result.  *Id.*

Postelle challenges the adequacy of both his trial counsel and appellate

counsel.  *See* Aplt. Br. at 2; *see generally Evitts v. Lucey*, 469 U.S. 387 (1985)

(establishing the right to effective *appellate* counsel).  As far as this appeal is

---

[1](...continued)
procedure inherent to the federal habeas process.  *See* Aplt. Br. at 35–38; Aple.
Br. at 23–37.  As the following makes clear, however, we have bypassed these
issues and gone straight to the substance of Postelle's appeal.  *See, e.g.*, *Nielander
v. Bd. of Cty. Comm'rs*, 582 F.3d 1155, 1166 (10th Cir. 2009); *Revilla v. Gibson*,
283 F.3d 1203, 1214 (10th Cir. 2002).

concerned, however, *both* claims derive from a single alleged error: trial counsel's failure to incorporate evidence of the Flynn Effect into Postelle's defense.

### 1. The Flynn Effect

We start with a short explanation of the Flynn Effect—an aspect of IQ testing upon which Postelle's petition heavily relies.

The Flynn Effect is an observed phenomenon believed to impact the accuracy of IQ testing. *See generally* John Matthew Fabian et al., *Life, Death, and IQ: It's Much More Than Just a Score: Understanding and Utilizing Forensic Psychological and Neuropsychological Evaluations in* Atkins *Intellectual Disability/Mental Retardation Cases*, 59 Clev. St. L. Rev. 399, 414–16 (2011). As the well-known scoring system makes clear, IQ testing does not aim to pinpoint the test subject's absolute intelligence. Instead, it attempts to measure his intelligence *relative to* the rest of the population. *See* Nancy Haydt et al., *Advantages of DSM-5 in the Diagnosis of Intellectual Disability: Reduced Reliance on IQ Ceilings in* Atkins *(Death Penalty) Cases*, 82 UMKC L. Rev. 359, 364 (2014). Accordingly, before administering a new IQ test to any one person, the creator must first "norm" it by scoring the performance of a sample group. Fabian et al., *supra*, at 414. Like zeroing a scale, this norming process identifies how someone of average intelligence should perform on the new test. *See id.* The test maker then keys that average performance to an IQ of 100 and constructs

-8-

a "normal" bell curve of performance around that point.  *See id.*; *see also* Haydt et al., *supra*, at 364 (explaining points on the IQ scale as corresponding to deviation from the mean on a normal curve).  Assuming the sample group accurately represented the general population, the test should now be capable of identifying any single taker's relative intelligence.  *See* Fabian et al., *supra*, at 414.

But in 1984, Dr. James Flynn published a study documenting an increase in average performance on IQ tests over time.  *See* James R. Flynn, *Tethering the Elephant: Capital Cases, IQ, and the Flynn Effect*, 12 Psychol. Pub. Pol'y & L. 170, 172 (2006).  Specifically, Flynn's findings indicated an upward creep of average IQ scores by about 0.33 points every year.  *See* John H. Blume et al., *Of* Atkins *and Men: Deviations from Clinical Definitions of Mental Retardation in Death Penalty Cases*, 18 Cornell J.L. & Pub. Pol'y 689, 700 (2009); Fabian et al., *supra*, at 414 (identifying a rate of 0.31 points per year); Richard J. Bonnie & Katherine Gustafson, *The Challenge of Implementing* Atkins v. Virginia*: How Legislatures and Courts Can Promote Accurate Assessments and Adjudications of Mental Retardation in Death Penalty Cases*,  41 U. Rich. L. Rev. 811, 838 (2007) (identifying a rate of 0.31 points per year).

Academic literature has since dubbed this phenomenon "the Flynn Effect," and it carries relatively straightforward implications for the accuracy of IQ testing:  The performance of the sample group used to norm an IQ test is obviously static—frozen in time.  But the average performance of all other test

-9-

takers gradually improves with each passing year.  Thus, just as a photo taken at dawn will not depict the brightness of noon, a sample group used to norm an IQ test in 1995 will not reflect average intelligence in 2005.[2]   On the contrary, because of the upward creep in average scores, we should expect a person of average intelligence in 2005 to score a 103 on an IQ test normed ten years earlier, rather than the usual 100.  *See* Blume et al., *supra*, at 701.  Conversely, if a person scores a 73 on an IQ test normed ten years before its administration, we may adjust his score downward to 70 to reflect his intelligence relative to today's general population.  *See id.*[3]

### 2.  Ramifications for Capital Punishment

Two lines of death penalty jurisprudence connect the Flynn Effect to this case.

---

[2]  The dissent at times characterizes this phenomenon as producing "bias in the IQ tests" administered to Postelle.  Dissent at 1.  To clarify, the Flynn Effect does not skew IQ test results based on the identity or personal characteristics of the test taker.  Rather, the Flynn Effect tells us that an IQ test indicates the test taker's intelligence relative to the norming group, and that the average intelligence of the norming group will often lag behind the average intelligence of the general population at the time of the test's administration.

[3]  We neither endorse nor reject the Flynn Effect as a scientific matter.  *But cf.* Aplt. Br. at 23, 40, 42 (arguing the Flynn Effect's validity).  Our analysis does not depend on its validity.  Instead, we assume for the sake of argument that the Flynn Effect is indeed a feature of intelligence testing that counsels in favor of the personalized IQ score revisions Postelle proposes.

The Supreme Court has read the Eighth Amendment's prohibition on "cruel and unusual punishments," U.S. Const. amend. VIII, to forbid "'[e]xcessive' sanctions." *Atkins v. Virginia*, 536 U.S. 304, 311 (2002). The federal courts determine whether a "punishment is excessive" according to currently prevalent standards. *Id.* And in *Atkins v. Virginia*, 536 U.S. 304 (2002) (quoting U.S. Const. amend. VIII), the Supreme Court observed "a national consensus . . . against" putting intellectually disabled persons to death. *Id.* at 316.[4] The Court therefore held states could not execute such persons, as that punishment would be "excessive" in the eyes of the Eighth Amendment. *See id.* at 314–17.

In addition, states cannot prevent a court or jury from hearing relevant, mitigating evidence during a capital sentencing determination. In *Lockett v. Ohio*, 438 U.S. 586 (1978), a plurality of Justices took the position that—pursuant to the Eighth Amendment—states must permit capital juries to "consider[]" all proffered mitigating evidence respecting the "defendant's character[,] . . . record[,] . . . [or] the circumstance of the offense" "in all but the rarest kind of capital case." *Id.* at 604 (Opinion of Burger, C.J.). Several years later, in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), a majority of the Court adopted, expanded, and applied that rule. *See id.* at 112–15. *Eddings* clarified "that the sentencer in capital cases

---

[4] The *Atkins* opinion used the then-accepted nomenclature "mentally retarded." *E.g. Atkins v. Virginia*, 536 U.S. 304, 316 (2002). Our opinions have since adopted the now-preferred term "intellectually disabled." *See Smith v. Duckworth* (*Smith II*), 824 F.3d 1233, 1242 (10th Cir. 2016).

-11-

must be permitted to consider any *relevant mitigating factor*."  *Id.* at 112
(emphasis added).  "Relevance" here takes the same meaning as in any other
evidentiary context—that is, relevant evidence has some "tendency to make . . .
any fact . . . of consequence . . . more . . . or less probable than it would be"
otherwise.  *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (quoting *McKoy v. North
Carolina*, 494 U.S. 433, 440 (1990)).

Flynn Effect evidence could potentially play an important role within each
of these two jurisprudential veins.  First, accounting for the Flynn Effect might
impact whom states may execute consistent with the Eighth Amendment.  This is
because IQ is one of the metrics commonly used to identify intellectual disability.
*See, e.g.*, *Atkins*, 536 U.S. at 308 n.3, 309 n.5, 317 & n.22.  Second, when the
death penalty is, in fact, available as a sentence, evidence of the Flynn Effect may
bear on the sentencer's *choice* to issue it in lieu of a lesser punishment.

### 3. *Postelle's Claims*

Postelle adopts both of these potential uses in his claims of ineffective
assistance.

*First*, Postelle argues his trial counsel should have used Flynn Effect
evidence to help exempt him from the death penalty under *Atkins*.  This is
because, under Oklahoma law, his entitlement to an intellectual disability

determination depended entirely on whether the court adjusted IQ scores to account for the Flynn Effect.

The Supreme Court has left to the states the task of "determining which offenders . . . in fact" fall within *Atkins*'s ambit. *Id.* at 317. To implement this directive, the State of Oklahoma has created a process whereby capital defendants may be adjudicated intellectually disabled either by the court prior to trial, *see* Okla. Stat. tit. 21, § 701.10b(E), or by the jury prior to determination of a sentence, *see id.* at § 701.10b(E)-(F). But a criminal defendant that scores a 76 or higher on any valid IQ test may not receive an *Atkins* determination under Oklahoma law. *See id.* at § 701.10b(C).

Postelle completed two separate IQ tests in 2006 and 2007 in anticipation of trial. *Postelle II*, slip op. at 12; Tr. 2870. He scored a 79 on the first and a 76 on the second. *Postelle II*, slip op. at 12. If adjusted for the Flynn Effect, Postelle contends, his two IQ scores would both have fallen to roughly 73. Aplt. Br. at 27–28.[5] He therefore argues his trial counsel should have used Flynn Effect evidence to get him an eligibility determination, and claims his appellate counsel rendered ineffective assistance by not raising trial counsel's omission on direct appeal. *See* Aplt. Br. at 2, 46.

---

[5] One of Postelle's proposed adjustments also accounts for a supposed norming error specific to the IQ test in question. *See* Aplt. Br. at 22 & n.8, 26–27 & n.10. Again, we assume the validity and accuracy of Postelle's IQ adjustments for the sake of argument.

*Second*, Postelle claims his trial counsel was ineffective for not using Flynn
Effect evidence in his sentencing determination, again faulting appellate counsel
for not raising this error on appeal.  *See id.* at 2.  This argument presents a more
direct attack on the failure to utilize the Flynn Effect.  So the logic goes, a capital
defendant may use *any relevant evidence* to convince a jury not to return a death
sentence.  Thus, Postelle claims counsel rendered deficient and prejudicial
performance by not mentioning the Flynn Effect in support of a lesser sentence.
*See* Aplt. Br. at 2, 18–24.

For the reasons stated below, however, neither argument justifies habeas
relief.

### 4. *The Eligibility Argument*

The OCCA's handling of Postelle's eligibility-based argument certainly
warrants AEDPA deference.

The OCCA clearly rejected Postelle's eligibility-based argument in his
application for post-conviction relief.  *See Postelle II*, slip op. at 11–13, 18–20.  It
explained that any attempt to exempt Postelle from the death penalty by virtue of
intellectual disability would have been fruitless.  *See id.* at 13.  We take this to
mean counsel was wise to strategically omit the evidence, and—by
extension—such omission could not have prejudiced Postelle's defense.  *See id.*
at 13.  Postelle therefore could not fault *appellate* counsel for failing to raise a
meritless claim of trial-counsel ineffectiveness on appeal.  *Id*. at 19.

The Oklahoma legislature established its statutory framework for implementing *Atkins* in 2006. *See* Okla. Stat. tit. 21, § 701.10b (effective July 1, 2006). Four years later, in *Smith v. State*, 245 P.3d 1233 (Okla. Crim. App. 2010), the OCCA deemed Flynn Effect evidence—"whatever its validity" —irrelevant to the statute's IQ cutoff. *Id.* at 1237 n.6. The defendant in *Smith* then sought federal habeas relief, arguing the Oklahoma court's decision contradicted *Atkins*. *See Smith II*, 824 F.3d at 1242. The district court denied the petition, and we affirmed. *See id.* at 1238. In so doing, we observed "*Atkins* does not mandate an adjustment for the Flynn Effect . . . and 'no decision of the Supreme Court squarely addresses the issue.'" *Id.* at 1246 (quoting *Hooks v. Workman* (*Victor Hooks II*), 689 F.3d 1148, 1170 (10th Cir. 2012) (brackets and ellipses omitted)). Thus, Smith had no right to habeas relief because Oklahoma's treatment of the Flynn Effect did not contradict or unreasonably apply Supreme Court precedent. *Id.*

Though the Supreme Court's more recent decision in *Hall v. Florida*, 134 S. Ct. 1986 (2014), did not bear on our analysis in *Smith*, *see Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003), we nevertheless explained that *Hall*, like *Atkins*, "says nothing about application of the Flynn Effect to IQ scores in evaluating a defendant's intellectual disability." *Smith II*, 824 F.3d at 1246. *Hall* deals only with the standard error measurement—a feature of IQ testing already accounted for in Oklahoma's statute. *See id.* at 1245–46.

-15-

In light of our decision in *Smith*, Postelle's eligibility-based argument
cannot further his claim of ineffective appellate counsel.  Regardless of whether
Postelle's counsel could have predicted it, Smith's experience clearly shows any
attempt to pursue an *Atkins* exemption through Flynn Effect evidence would have
failed.  Indeed, the exact same argument failed in *Smith*, and Postelle gives us no
reason to believe that his trial and appeal would have turned out any differently.
His claim therefore falls far short of the requirements necessary to show prejudice
under *Strickland*.  *See, e.g.*, *Grant v. Royal*, 886 F.3d 874, 905 (10th Cir. 2018).

Accordingly, Postelle's claim of ineffective appellate counsel cannot draw
support from his eligibility-based argument.  Far from contradicting or
unreasonably applying Supreme Court precedent, the OCCA rendered sound
analysis to reach a permissible result.

### 5.  *The Mitigation Argument*

Postelle's mitigation-based argument presents a more complex analysis.  In
the end, however, it too fails to persuade us.

### a.  *The State Court Adjudication*

To begin, the state-court adjudication of the *mitigation-based* Flynn Effect
argument differs markedly from that of the *eligibility-based* argument.

Postelle's only mention of the Flynn Effect as *mitigation* evidence in his
state post-conviction briefing appears at the tail end of his eligibility-based
argument.  There his application states—without elaboration—that "even if

counsel had been unsuccessful in obtaining a pre-trial finding that Mr. Postelle is [intellectually disabled], counsel could have still presented the evidence as mitigation during the second stage of his trial."  PCR Appl. at 10.

Under its most reasonable interpretation, the OCCA opinion did not comment on this throw-away assertion.  *Cf. Johnson v. Williams*, 133 S. Ct. 1088, 1055 (2013) ("[A] state court may not regard a fleeting reference to a provision of the Federal Constitution or federal precedent as sufficient to raise a separate federal claim.").  Instead, it focused solely on the eligibility argument in rejecting Postelle's Flynn Effect–based ineffective assistance of counsel theory.  *See Postelle II*, slip op. at 11–13 (expressly addressing eligibility without explicitly mentioning mitigation); *id.* at 13–17 (discussing the adequacy of Postelle's mitigation defense without mentioning the Flynn Effect); *id.* at 18–20 (incorporating the trial-counsel analysis into Postelle's appellate counsel claim).  And even if we look at the decision most broadly, the only colorable partial reference to the mitigation-based argument is the OCCA's sweeping rejection of *any* ineffective assistance of appellate counsel claim premised on the mitigation defense.  In relevant part, this followed from the OCCA's conclusion that trial counsel had not, in fact, rendered ineffective assistance in the mitigation phase. *See id.* at 19–20.

We will not, however, read the OCCA opinion to contradict the *Lockett* line of cases as Postelle argues we should.  Under Postelle's reading, the OCCA held

that *Smith v. State* compelled exclusion of Flynn Effect evidence from capital *sentencing* proceedings.  Aplt. Br. at 14–15, 18, 25, 30, 35, 39.  This would indeed contradict the *Lockett* line of cases, as evidence of the Flynn Effect clearly meets the low bar of relevance to the sentencing determination in light of *Atkins*.  But this reading of the OCCA opinion is untenable.[6]  In excluding Flynn Effect evidence from the eligibility calculus, *Smith v. State* in no way addressed its use as mitigating evidence.  *See* 245 P.3d at 1237.  In addition, and more importantly, we see nothing in the OCCA opinion in this case making that leap.  *See Postelle II*, slip op. at 11–13.  Moreover, the OCCA ably applied the *Lockett* line of cases on Postelle's direct appeal, *see Postelle I*, 267 P.3d at 140–41, giving us little if any reason to believe it would ignore those cases on Postelle's state collateral review.

Accordingly, whether we read the OCCA to reject the mitigation-based argument silently or implicitly to sweep it into a broader analysis, our task would be the same.  Postelle has neither asserted the OCCA ignored his mitigation-based argument nor shown a contradiction of *Lockett* and its progeny.  We thus ask only whether the OCCA reasonably applied *Strickland* in denying a claim to relief

---

[6] The dissent also rejects Postelle's reading of the OCCA opinion.  The dissent proceeds to de novo review on a different theory, which we address more fully below.  *See infra* p. 19 n.7.

under Postelle's mitigation-based Flynn Effect theory.  *See Williams v. Trammell*,

782 F.3d 1184, 1201–02 (10th Cir. 2015).[7]  We conclude that it did.

_____

[7]  The dissent proceeds to de novo review because, in its view, "[b]y failing to address Postelle's [mitigation] argument . . . , the OCCA failed to adjudicate Postelle's claim on its merits."  Dissent at 13.  But when a state court "addresses some but not all of a [habeas petitioner's] claims," we presume that the court silently rejected remaining claims on the merits.  *Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013).  Of course, a petitioner can rebut that presumption by giving us "some reason to think some other explanation for the state court's decision is more likely."  *Harrington v. Richter*, 562 U.S. 86, 99–100 (2011).  To do so, however, the petitioner must point to some "indication" that the state court ignored the claim or rejected it on grounds of state procedure.  *Id.* at 99.

Yet Postelle has never so much as attempted to argue that the OCCA ignored his mitigation-based claim.  *See* Aplt. Br. at 14–18 (applying the OCCA's discussion of the eligibility-based argument to the mitigation-based argument); Reply Br. 8–13 & n.2 (same).  And though the OCCA *could have* procedurally barred the claim under Oklahoma rules of post-conviction procedure, *see Postelle II*, slip op. at 11, neither Postelle nor the dissent gives us any reason to believe the OCCA did so, *cf. James v. Ryan*, 733 F.3d 911, 915 (9th Cir. 2013) (observing that the express application of a state procedural bar can rebut the *Richter* presumption).  And we think that explanation quite unlikely given the OCCA considered the merits of Postelle's other ineffective assistance claims after noting the procedural bar.  *See Postelle II*, slip op. at 11–17.  Thus, if we did read the OCCA opinion to omit any discussion of the claim, the law would compel us to presume the claim's silent rejection on the merits.  Postelle would then bear the burden to show "there was *no reasonable basis* for the state court to deny relief" under *Strickland*.  *Richter*, 562 U.S. at 98.

Moreover, in concluding the OCCA ignored Postelle's mitigation-based claim, the dissent's position raises the question of whether Postelle fairly presented that claim to the OCCA in the first place.  *See, e.g.*, *Grant v. Royal*, 886 F.3d 874, 890–92 (10th Cir. 2018).  And if the OCCA did indeed reject the claim on state procedural grounds, the dissent would have to hold those grounds inadequate before it could justify habeas relief.  *See Walker v. Martin*, 562 U.S. 307, 315 (2011); *see also* Aple. Br. at 30–33 (defending Oklahoma's procedural bar for ineffective assistance claims not raised on direct appeal).  Though we have

(continued...)

-19-

### b. Deficient Performance

The OCCA reasonably concluded Postelle's trial counsel did not perform deficiently by omitting Flynn Effect evidence from the mitigation case.

As we have already mentioned, "our review of counsel's performance under the first prong of *Strickland* is a 'highly deferential' one." *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (quoting *Hooks v. Workman* (*Danny Hooks*), 606 F.3d 715, 723 (10th Cir. 2010)). "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Grant*, 886 F.3d at 903 (alteration in original) (quoting *Victor Hooks II*, 689 F.3d at 1187). Indeed, a showing of deficient performance requires proof that counsel's conduct was "not merely wrong," but "outside the wide range of professionally competent assistance." *Id.* (quoting *Danny Hooks*, 606 F.3d at 723). With regard to a charge of inadequate investigation in particular, we ask whether counsel's conduct was reasonable in light of all the circumstances. *See Newmiller v. Raemisch*, 877 F.3d 1178, 1196 (10th Cir. 2017). And it is particularly relevant to this case that we make "[e]very effort . . . to evaluate the conduct from counsel's perspective at the

---

[7](...continued)
bypassed these issues given our interpretation of the OCCA opinion and resolution of the merits, the dissent simply leaves them unresolved. In sum, the OCCA's rejection of this claim warrants deference under AEDPA's standards.

time." *Grant*, 886 F.3d at 903 (quoting *Littlejohn v. Trammell* (*Littlejohn I*), 704 F.3d 817, 859 (10th Cir. 2013)).

We recognize the Flynn Effect was not wholly foreign to criminal defense advocates at the time of Postelle's trial. So far as we can tell, the first discussion of the phenomenon by an American court appeared roughly five years earlier in a footnote to a federal district court opinion in Virginia. *See Walton v. Johnson*, 269 F. Supp. 2d 692, 699 n.5 (W.D. Va. 2003), *vacated*, 440 F.3d 160 (4th Cir. 2006) (en banc). It was thereafter mentioned, though not much explained or discussed, in a dissent to an opinion of the Eleventh Circuit. *See In re Hicks*, 375 F.3d 1237, 1242–43 (11th Cir. 2004) (Birch, J., dissenting). In 2004, four years before Postelle's trial, the California Court of Appeals became the first tribunal to *require* adjustment of an IQ score to account for the Flynn Effect. *See People v. Superior Court*, 21 Cal. Rptr. 3d 542, 568 (Cal. Ct. App. 2004), *vacated*, 109 P.3d 68 (Cal. 2005). Several other courts did the same within the next few years. *See Walker v. True*, 399 F.3d 315, 322–23 (4th Cir. 2005) (observing a place for Flynn Effect evidence under Virginia law); *Wiley v. Epps*, 668 F. Supp. 2d 848, 894 (N.D. Miss. 2009). And the legal academy weighed in as well. *See* Bonnie & Gustafson, *supra*, at 837–38; Dora W. Klein, *Categorical Exclusions from Capital Punishment: How Many Wrongs Make A Right?*, 72 Brook. L. Rev. 1211, 1231–32 n.89 (2007).

But hindsight makes this material deceptively easy to find.  Indeed, prior to September 2008, only a small proportion of cases and secondary literature citing *Atkins* mentioned the Flynn Effect.[8]  In fact, a review of our own opinions, the opinions of the federal district courts in our circuit, as well as the courts of the states that comprise our circuit yields only a single mention of the Flynn Effect before Postelle's trial.  That passing reference occurred in a footnote of *Myers v. State*, 130 P.3d 262, 268 n.11 (Okla. Crim. App. 2005), a decision upholding the jury's finding that the defendant was *not* intellectually disabled despite scoring in the 60s on several separate IQ tests.  *See id.* at 267–68 & n.10.  Thus, the notion that Postelle's counsel *necessarily* rendered substandard advocacy by not using the Flynn Effect as mitigating evidence in Postelle's 2008 trial cannot be sustained.

More importantly, though, Postelle gives us no reason to believe counsel ignored or failed to properly solicit expert advice on this subject.  The Flynn Effect is not a legal concept.  It is a phenomenon that might affect how IQ tests are administered, scored, and evaluated.  We should thus expect that if the

---

[8]  The dissent has identified many appearances of the Flynn Effect in judicial opinions and academic literature prior to Postelle's 2008 trial.  *See* Dissent at 9 & n.1.  But the question is not whether Postelle's counsel could have found references to the Flynn Effect after knowing to look for them.  The question is whether the Flynn Effect featured so prominently in capital cases and literature prior to Postelle's trial that any failure to discover it would indicate severe professional incompetence.  Indeed, the dissent's analysis succumbs to the hindsight bias our court has cautioned against.  *See, e.g.*, *Grant*, 886 F.3d at 903.

psychiatric community widely recognized Dr. Flynn's research prior to Postelle's trial, the defense's mental health expert, Dr. Ruwe, would have alerted counsel to its potential value.  This is precisely the reason lawyers seek out expert assistance in the first place.  *See* American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 956 (2003) [hereinafter ABA Guidelines]; *cf. Wilson v. Sirmons*, 536 F.3d 1064, 1089 (10th Cir. 2008) ("[I]n many situations, the expert will know better than counsel what evidence is pertinent to mental health diagnoses and will be more equipped to determine what avenues of investigation are likely to result in fruitful information."), *reinstated sub nom.*, *Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009) (en banc); *id.* at 1133 (Tymkovich, J., concurring in part and dissenting in part) ("When investigating a defendant's mental health, counsel by necessity often relies on expert assistance.").  Indeed, just as "[c]ounsel's own observations . . . , while necessary, can hardly be expected . . . to detect . . . conditions" like intellectual disability, ABA Guidelines, *supra*, at 956 (footnote omitted), we should likewise not expect the lawyer to know more than the clinical neuropsychologist about the fine details of scoring IQ, *see id.* at 1002 ("[T]he provision of high quality legal representation in capital cases requires a *team approach* that combines the *different skills, experience, and perspectives of several disciplines*." (emphasis added)).  And in this case, despite having been evaluated by two mental health professionals, Postelle points us to no evidence in

this voluminous record indicating either expert alerted counsel to the existence of the Flynn Effect.

Admittedly, the academic literature gives some indication that the Flynn Effect may have been "outside the ken of many mental health clinicians" at the time of Postelle's trial. Bonnie & Gustafson, *supra*, at 856. But of course, that fact further weakens the case for deficient performance; the less well-known it was in the mental health community, the less likely a competent attorney would identify it through due diligence. And indeed, given Dr. Ruwe's extensive experience doing mental-health evaluations for the purpose of litigation, *see* Tr. 2846, we think it all the more reasonable for Postelle's counsel to have thought Dr. Ruwe would offer the most promising mental health–based mitigation arguments.

This is not to say an attorney can abdicate all responsibility for handling scientific or technical evidence. On the contrary, counsel's "managerial role" requires "continue[d] exercise [of] supervisory authority over" expert witnesses and advisors to "ensur[e] that [they] examine[] [necessary] sources of information." *Wilson*, 536 F.3d at 1089 (majority opinion). But having provided Dr. Ruwe with the information necessary to test Postelle's intelligence, we think counsel's reliance on expert advice in the administration and scoring of Postelle's testing was at least within the bounds of professional competence. *Cf. id.* at 1089–90 (stating counsel can reasonably rely on expert opinion "once either the

expert or counsel has consulted all readily available sources" of mitigating

evidence, *id.* at 1089).[9]

Neither is the defense team's supposed failure to recognize the potential

importance of the Flynn Effect altogether surprising.  Had either counsel or expert

consulted the Diagnostic and Statistical Manual of Mental Disorders (DSM)

current at the time of Postelle's trial, they would have found no mention of the

Flynn Effect at all.  *See* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual

of Mental Disorders 41–49 (4th ed., text rev. 2000).  Not until 2013—five years

*after* Postelle's trial—did the DSM reference the Flynn Effect, and even then only

vaguely as a "[f]actor[] that may affect test scores" on account of "overly high

scores due to out-of-date test norms."  Am. Psychiatric Ass'n, Diagnostic and

Statistical Manual of Mental Disorders 37 (5th ed. 2013).

And all of this simply *assumes* counsel never discovered the Flynn Effect.

*But see* Aplt. Br. at 6 ("Defense counsel was unaware of, *or disinterested in* the

Flynn Effect . . . ." (emphasis added)).  But in fact, the record does not foreclose

the possibility that Postelle's defense team knew about the Flynn Effect and made

_____

[9]  Our analysis does not state or imply that a capital defense attorney may "delegate development of the overall litigation strategy" to an expert witness. Dissent at 1.  Clearly that responsibility falls to counsel alone.  But where, as here, *counsel* has decided to argue poor mental health and diminished cognitive function as mitigating factors justifying a lesser sentence, counsel may indeed presume that a qualified expert in the field of clinical neuropsychology would *apply that expertise* to the chosen strategy.

a *strategic choice* to omit it from the mitigation case.  As the OCCA may have recognized, the difference of a few IQ points was not some magical key to success.  And the possible marginal benefit of raising the issue carried with it the additional risk of provoking a "battle of the experts" which could have detracted from the relatively strong evidence of mental impairment Postelle *did* put on.  *Cf.* Aplt. Br. at 40–41 (acknowledging that Flynn Effect evidence might provoke debate even if valid).  We discuss this tradeoff more fully below with regard to prejudice.  But it suffices to say we disagree that any choice to omit Flynn Effect evidence from the mitigation case would necessarily amount to an egregious practice error.

In sum, Postelle's petition appears to fall well short of showing the plainly incompetent and unprofessional conduct necessary to support a charge of deficient trial-counsel performance.  Thus, the OCCA applied *Strickland* reasonably to determine Postelle's counsel had not performed deficiently, and we defer to its judgment.

### c. Prejudice

Postelle has also failed to make a strong showing that the omission of Flynn Effect evidence prejudiced his mitigation defense.

*Strickland*'s prejudice prong requires Postelle to "demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Grant*, 886 F.3d at 905 (quoting

-26-

*Littlejohn v. Royal* (*Littlejohn II*), 875 F.3d 548, 552 (10th Cir. 2017)).  This

means the errors must "undermine [our] confidence in the outcome" of Postelle's

sentencing.  *Newmiller*, 877 F.3d at 1197 (quoting *Strickland*, 466 U.S. at 694).

Of course, in a case such as this, a single juror's choice to impose a sentence less

than death meets that standard.  *Littlejohn II*, 875 F.3d at 553.  Even still, "[t]he

likelihood of a different result must be substantial, not just conceivable."

*Newmiller*, 877 F.3d at 1197 (quoting *Harrington v. Richter*, 562 U.S.86, 112

(2011)).

     In considering whether an inadequate investigation prejudiced a habeas

petitioner, we "reweigh the evidence" on both sides, this time accounting for the

petitioner's proposed additions.  *Littlejohn II*, 875 F.3d at 553 (quoting *Victor

Hooks II*, 689 F.3d at 1202).  This exercise also requires us to account for how the

state would have responded to the omitted evidence.  *E.g.*, *id.*

     Postelle's mitigation case had several clear focal points.

     The first of these was Postelle's difficult upbringing.  The jury heard how

Postelle's mother had abused and starved him as a young child.  Court's Ex. 12

at 2654 (introduced at Tr. 2695).  It heard how she "made [him] feel rejected and

unloved."  Video recording: Patsy Postelle Mitigation Testimony (Defendant's

Ex. 2, introduced at Tr. 2844).  It heard how, when she eventually gave him up to

his grandparents, he was "malnutrishioned, filthy, and [had] sores on [his]

bod[y]."  *Id.*  The jury heard how thereafter Postelle's mother "refused to take

telephone calls from [him or] have anything further to do with [him]." *Id.* The jury was also told that Brad Postelle's new girlfriend obstructed the father-son relationship. *See id.*; Tr. 2712–13, 2747. Finally, the jury learned that, despite all of this, Postelle selflessly cared for his bedridden grandfather, *see* Tr. 2749, 2814, and later, his handicapped father, *see* Tr. 2785–86.

Postelle's mitigation case also focused on the role methamphetamine played in his life from an early age. This included evidence of family members cooking and using meth during Postelle's childhood. *See* Tr. 2698, 2753, 2767, 2770, 2793–94. The jury also heard about Postelle's initiation into meth use himself at the age of twelve or thirteen, including openly ingesting the drug in front of his father and other family members. *See* Tr. 2698, 2711, 2728, 2752. In fact, the evidence even indicated that Brad Postelle *supplied* meth to little Gil. Tr. 2765.

Finally, and most relevant to this appeal, the mitigation case concluded with expert testimony regarding Postelle's mental function. *See* Tr. 2844–96. Dr. Ruwe had run roughly thirty different tests on Postelle. Tr. 2848. He testified that Postelle had "pretty significant [neurocognitive] impairments," along with "pretty severe psychological difficulties." Tr. 2849. These included "pretty pronounced problems with remembering information" and "difficulty with reasoning, especially verbal reasoning." Tr. 2850. Dr. Ruwe told the jury that Postelle gave off "clear[] indications of paranoia[ and] disorganized thinking." Tr. 2851. And, according to Dr. Ruwe's assessment, the parts of Postelle's brain

responsible for "impulse control, making good decisions, [and] well reason[ed] judgments" had not developed fully or normally by the time of the murders.  Tr. 2856; *see also* Tr. 2857 ("Generally, what that tells us is that the drugs, along with the normal developmental process, makes it more difficult for [Gilbert Postelle] to make good decisions.").  Postelle even displayed "symptoms consistent with a post traumatic stress disorder."  Tr. 2863.

Moreover, Dr. Ruwe explained, Postelle had not always been this way. Based on tests administered before Postelle dropped out of school, Dr. Ruwe concluded the young Postelle "was performing pretty consistently in the average, unlike current testing."  Tr. 2852.  "[H]e probably would have had a learning disability or would have qualified for special services," but he had markedly better brain function.  Tr. 2852.  And though it was somewhat speculative, Dr. Ruwe attributed most of Postelle's mental difficulties "to the longstanding chronic use of drugs and methamphetamine, which are known to have a pretty pronounced impact on cognitive functions, especially memory."  Tr. 2853–54.

This testimony culminated in an apparent attempt to cast Postelle as a victim of circumstance, rather than a lost cause.  He knew right from wrong.  *See* Tr. 2865.  He was *capable* of choosing between the two.  *See* Tr. 2866.  He was young and would continue to mature.  *See* Tr. 2868.  Perhaps the structured environment of prison was the best way to reform him.  *See* Tr. 2866.

Though Postelle makes much of Dr. Ruwe's concession that he *did not* reach the level for "a diagnosis of [intellectual disability]," Tr. 2861; *see* Aplt. Br. at 5, 6, 7, 32, 38, 44, 49, this comment was not overly prejudicial in context or even necessarily wrong in light of Flynn Effect evidence.  Indeed, Dr. Ruwe testified Postelle was not intellectually disabled *but instead* "in the borderline range" of intellectual functioning.  Tr. 2861.  His main point was that Postelle fell "pretty close to" an intellectual disability diagnosis, which would "start somewhere around [an IQ of] 70."  Tr. 2861.  Of course, that would have also been true of Postelle's Flynn Effect–adjusted scores.  In fact, Dr. Ruwe placed Postelle "in the 5th percentile range" of relative intelligence, meaning "95 out of 100 . . . [people probably] function[] at a higher level."  Tr. 2862.  With Flynn Effect–adjusted scores, Postelle would still have slotted into a relatively similar band.  *See* Haydt et al., *supra*, at 364.  Furthermore, Dr. Ruwe clarified that people are "able to function pretty well *until they get down into that borderline range*[]."  *Id.* (emphasis added).  There, said Dr. Ruwe, people like Postelle "start developing more pronounced problems with . . . some of the things that we typically take for granted," including "working in the competitive employment force" and "independent living."  *Id.*

Postelle also stresses the "uniquely mitigating" nature of intellectual-disability evidence as support for incorporating the Flynn Effect.  *See* Aplt. Br. at 12–13, 45.  But this is not a case where counsel simply ignored such evidence

or used it *against* the defendant. *Cf. Smith v. Mullin*, 379 F.3d 919, 939–44 (10th Cir. 2004) (finding ineffective assistance where counsel completely failed to incorporate a substantial body of mental health evidence into the mitigation defense). As we have just explained, Postelle's counsel stressed his poor mental health and severe intellectual difficulties in the final stanza of the mitigation case. Our proper focus is thus the *marginal* benefit of Flynn Effect evidence in light of the other evidence presented, as well as its *marginal* potential cost to the overall mitigation strategy.[10]

We have no reason to believe an attempt to use Flynn Effect evidence would have gone unchallenged by the prosecution either. As we mentioned above, incorporation of this evidence might have caused the mitigation phase to devolve into a confusing and tangential "battle of experts" on the validity and practical significance of the Flynn Effect. Not only would this have risked distracting the jury from more salient issues, it might also have alienated jurors

---

[10] We disagree with the dissent's prejudice analysis on this point. As a scientific and practical matter, there just is not much difference between an IQ slightly below 75 and an IQ slightly above 75—certainly not so much as to fairly indicate Postelle definitively "lack[ed]," rather than possessed, "the intellectual capacity to bear full culpability for his crimes." Dissent at 16. Indeed, the concept of standard error would itself rebut such an inference. *See Hall v. Florida*, 134 S. Ct. 1986, 2000 (2014) ("An IQ score is an *approximation*, not a final and infallible assessment of intellectual functioning." (emphasis added)). And if evidence of possible intellectual disability is so strongly mitigating, then evidence of functioning in the borderline range is at least somewhat mitigating— and plainly not aggravating.

sensitive to a defense that appeared to be focusing on minor side issues.  Indeed, even absent a central focus on IQ scores, the state still brought Postelle's much-higher nonverbal IQ to light.  *See* Tr. 2875–77.  And though the Flynn Effect could have opened the door to an argument that Postelle's IQ might actually fall below 70 after accounting for standard error, *see* Aplt. Br. at 25, that point cuts both ways.  Indeed, the state itself introduced the margin-of-error concept to *attack* Postelle's IQ-based argument.  *See* Tr. 2871.

In sum, the OCCA reasonably concluded the omission of Flynn Effect evidence did not prejudice Postelle's defense, and that application of *Strickland* warrants deference on both the trial-counsel claim and the appellate-counsel claim.

\* \* \*

In light of the above, the district court did not err in rejecting Postelle's mitigation-based ineffective assistance claims.  The OCCA's rejection of these claims on the merits warrants deference under federal habeas law.

### B.  *Victim Impact Evidence*

Postelle also claims the erroneous introduction of victim-impact evidence during the penalty phase of his trial prejudiced his defense.  Again, we disagree.

In *Booth v. Maryland*, 482 U.S. 496 (1987), the Supreme Court interpreted the Eighth Amendment to prohibit capital juries from considering evidence of a crime's impact on the victim and his family as part of its sentencing decision.  *See*

*id.* at 501–02.  Such evidence, the Court explained, "may be wholly unrelated" to the defendant's "blameworthiness" because he "often will not know the victim, and therefore will have no knowledge about the existence or characteristics of the victim's family." *Id.* at 504.  Moreover, the Court reasoned that capital defendants "rarely select their victims based on whether the murder will have an effect on anyone" else. *Id.*  Victim-impact evidence might thus contribute to death sentences premised upon "factors about which the defendant was unaware, and that were irrelevant to the decision to kill." *Id.* at 505.  In sum, victim-impact evidence had no place in the jury's sentencing task: "determining whether the death penalty is appropriate in light of the background and record *of the accused* and the particular circumstances *of the crime*." *Id.* at 507 (emphasis added).

But the Court revisited *Booth* a few years later in *Payne v. Tennessee*, 501 U.S. 808 (1991).  *Payne* recognized "the assessment of harm" resulting from a crime "has understandably been an important concern of the criminal law" in determining both guilt and punishment.  *Id.* at 819.  The Court thus held states *could* present "evidence of the specific harm caused by the defendant" to the jury at sentencing, *id.* at 825, including "evidence about the victim and about the impact of the murder on the victim's family," *id.* at 827.

Even still, as the Court has recently pointed out, "*Payne* 'specifically acknowledged its holding did not affect' *Booth*'s prohibition on [characterizations of and] opinions about the crime." *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (per

curiam) (emphasis added) (quoting *Ledbetter v. State*, 933 P.2d 880, 890 (Okla. Crim. App. 1997)); *see also id.* ("'*Booth* . . . held that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment,' but no such evidence was presented in *Payne*, so the Court had no occasion to reconsider that aspect of the decision." (quoting *Payne*, 501 U.S. at 830 n.2)). Thus, in conducting capital sentencing proceedings, state courts must still take care to exclude evidence that goes beyond a victim's subjective suffering and strays into description of the defendant's conduct.

The Oklahoma courts ignored that prohibition in this case. At the prosecution's request, several family members of the victims read prepared statements to the jury. *See* Tr. 2653–55, 2657–60. As relevant to this appeal, James Alderson's brother described Alderson's gruesome injuries. "On advice of the funeral director," he said, "we decided not to allow [our mother] to view Jimmy's body." Tr. 2654. Due to "[t]he disfigurement caused by head and facial wounds," Alderson's mother therefore "never had a chance for "a final goodbye." *Id.* Amy Wright's mother then testified to "know[ing] that [Amy] was chased from her home and shot in the back . . . without apparent reason." Tr. 2657. As the court below determined, this testimony overstepped the fine line between *Booth* and *Payne*, effecting a constitutional violation. R., Vol. I at 626. And because the OCCA did not enforce *Booth*'s restrictions on appeal, *see id.*; *see also*

*Postelle I*, 267 P.3d at 142–43 (relevant discussion), we do not grant it deference on this issue. *See* 28 U.S.C. § 2254(d).

But this does not entitle Postelle to automatic relief. Instead, much like in the ineffective assistance context, he must show the error of admitting impermissible victim-impact evidence prejudiced his defense. *See Welch v. Workman*, 639 F.3d 980, 1002 (10th Cir. 2011); *see also Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993) (establishing the standard). This analysis requires us to consider all of the evidence from both stages of the trial. *See Welch*, 639 F.3d at 1004; *see also Lockett v. Trammel*, 711 F.3d 1218, 1239 (10th Cir. 2013) ("In evaluating whether the unconstitutional portions of the . . . statement had a substantial and injurious effect on the jury, we must consider it in the context of all of the aggravating and mitigating evidence."). In so doing, we ask whether the jury still would have found the aggravating circumstances outweighed the mitigating factors without the testimony in question. *See Lockett*, 711 F.3d at 1239–40; *DeRosa v. Workman*, 679 F.3d 1196, 1240 (10th Cir. 2012); *Welch*, 639 F.3d at 1004.

We have already described the mitigation case Postelle presented. It included testimony regarding abuse, neglect, mental illness, intellectual difficulties, and the corrosive influence of drugs.

But the jury thought that evidence could not outweigh the aggravating circumstances. In particular, the jury found the same two aggravating

-35-

circumstances present in all four murders:  First, it found Postelle "knowingly created a great risk of death to more than one person" in each case.  Dir. App. R., Vol. VIII at 1550–53.  This is, of course, an obvious conclusion to draw in a case involving multiple homicides.  Second, the jury found the murders "especially heinous, atrocious, or cruel."  *See id.*  According to the instructions, this meant the jury found beyond a reasonable doubt that (1) "either torture . . . or serious physical abuse of the victim[s]" preceded the murders, and (2) "the murder[s] [were] . . . extremely wicked or shockingly evil . . . outrageously wicked or vile . . . [or] pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others."  *Id.* at 1521.  In this context, "'torture' means the infliction of either great physical anguish or extreme mental cruelty."  *Id.*  Moreover, a finding of "serious physical abuse" or "great physical anguish" must include a finding "that the victim experienced conscious physical suffering prior to . . . death."  *Id.*

The victim-impact statements could not have been decisive in a single juror's balancing.  The testimony in question centers on two main points: (1) that James Alderson had disfiguring head and facial wounds, Tr. 2654, and (2) that Amy Wright ran for her life only to be randomly killed, Tr. 2657.  Both of these statements were substantially redundant and relatively mild when compared to other evidence.

The state had already introduced substantial evidence of Mr. Alderson's wounds. It had presented detailed testimony from a forensic pathologist in the office of the state medical examiner regarding Mr. Alderson's autopsy. *See* Tr. 1450–56. That witness recounted Mr. Alderson's "compound open fracture" on the top of his head, Tr. 1454, as well as how a bullet had hit his jaw bone, *see* Tr. 1455. Clear diagrams of Mr. Alderson's face and body had aided this description. *See* Ex. 161, 163. A second witness, a forensic consultant, had also described Mr. Alderson's injuries to the jury. Tr. 1549–52. And all of this testimony had followed the state's introduction of a close-up photo of Mr. Alderson's body from the crime scene, showing the open wound on the top of his head. *See* State's Ex. 54 (introduced at Tr. 1402). Mr. Alderson's brother's statement thus contributed little to the jury's understanding of Mr. Alderson's disfigurement.

So too, the guilt-phase evidence had already painted a more vivid image of Amy Wright's final moments. When police arrived at the scene, they found bullet casings in the trailer, *see* Tr. 1498–1500; *see also* State's Ex. 100, 101, 105, 108, 110, and the back door flung wide open, *see* Tr. 1249. They discovered Ms. Wright's body face down on the grass, obviously shot to death. *See* Tr. 1243–45. She was in close proximity to a solid metal fence that hemmed in the property, *see* Tr. 1388, and she had gravel and grass under her fingernails as though she had been clawing at the ground or other objects, *see* Tr. 1406. Despite being outside in a junk-filled scrapyard, *see* Tr. 1562, Ms. Wright was not wearing her shoes,

*see* Tr. 1552.  According to the autopsy, she had sustained three gunshot wounds, all from behind.  *See* Tr. 1457.  Pulling together this evidence, the forensic consultant offered his interpretation of the events:  The four victims had been at ease within the trailer home when they experienced some sort of "blitz attack."  Tr. 1561.  With regard to Ms. Wright in particular, the evidence was consistent with her attempting to flee only to be shot in the midst of escape.  *See* Tr. 1569–70.  Surely, then, the jury had already concluded Ms. Wright ran for her life before being gunned down for no other reason than that she was in the wrong place at the wrong time.

Our review of the record thus compels the conclusion that the victim-impact evidence erroneously admitted did not affect Postelle's sentence.  In fact, even if we assumed for the sake of argument that the jury should have also heard Flynn Effect evidence as part of the mitigation case, *see* Aplt. Br. at 52–53 (arguing for a cumulative-error analysis), we do not think the impermissible victim-impact statements could have influenced even a single juror.  These statements simply told the jurors what they each already knew.

We thus affirm denial of Postelle's habeas petition on this ground.

### C.  *Expansion of the Certificate of Appealability*

As a final matter, we reject Postelle's request to expand the scope of his appeal.

Postelle has asked us to expand the scope of his appeal to cover three additional issues.  *First*, he wishes to challenge the district court's ruling that Oklahoma did not contradict or unreasonably apply *Atkins* in sentencing him to death.  *See* Mot. Broaden Certificate of Appealability at 15–17 [hereinafter COA Mot.].  *Second*, he seeks permission to appeal the district court's determination that Oklahoma did not contradict or unreasonably apply the *Lockett* line of cases in refusing to admit David Postelle's lesser sentence as mitigating evidence.  *Id.* at 3–8.  *Finally*, he requests an appeal of the district court's procedural ruling denying him a stay and abatement or leave to amend his habeas petition.  *See id.* at 8–15.

When a federal district court denies a state prisoner's petition for habeas corpus, he has no absolute right to appeal.  *See Slack v. McDaniel*, 529 U.S. 473, 480–81 (2000).  We may, however, grant the petitioner permission to challenge the district court's resolution of discrete, specified issues through a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c).  But a petitioner must make "a substantial showing of the denial of a constitutional right" to justify our doing so. *Id.* at § 2253(c)(2).  This means he "must demonstrate that reasonable jurists would find the district court's assessment of the [relevant] constitutional claim[] debatable or wrong." *Slack*, 529 U.S. at 484; *see Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  In considering whether a petitioner has made such a showing,

-39-

we incorporate Congress's mandate of deference to state court decisions. *Dockins v. Hines*, 374 F.3d 935, 938 (10th Cir. 2004).

Reasonable jurists could not debate the correctness of the additional district court rulings Postelle seeks to appeal.

### 1. The Atkins Claim

We need not hear appeal on Postelle's *Atkins* claim because our precedent forecloses relief.

We have already twice held that Oklahoma's rejection of the Flynn Effect as irrelevant to the *Atkins* analysis does not contradict or unreasonably apply *Atkins*. *See Smith*, 824 F.3d at 1244–46. Postelle recognizes these holdings, but argues that other Supreme Court precedents, specifically *Lockett* and its progeny, compel states to consider the mitigating value of Flynn Effect evidence in applying *Atkins*. COA Mot. at 17. But the *Lockett* line of cases only applies to *relevant* evidence, and only as it relates to the *choice* to impose the death penalty. Thus, because we have already determined that a state—consistent with *Atkins*—may deem Flynn Effect evidence *irrelevant* to death penalty *eligibility*, our precedents still preclude Postelle's argument. Reasonable jurists therefore could not debate this issue. *See, e.g.*, *United States v. Tafoya*, 557 F.3d 1121, 1129 (10th Cir. 2009). Accordingly, we must deny Postelle permission to raise it on appeal.

### 2. David Postelle's Sentence as Mitigating Evidence

Neither can we permit Postelle to appeal the district court's ruling on the exclusion of David Postelle's sentence as mitigating evidence.

When Postelle raised this issue in state court, the OCCA correctly noted the constitutional requirement that "the proffered evidence . . . relate to the defendant's personal circumstances, [that is], his character, record or circumstances of the offense." *Postelle I*, 267 P.3d at 141. To be sure, some courts have determined that evidence of a codefendant's sentence is relevant to capital sentencing. *See id.* at 140–41 (collecting cases). But the question we must answer is whether the OCCA unreasonably applied or contradicted *Lockett* and its progeny in rejecting Postelle's argument and taking the opposite stance. And the presence of a legitimate controversy regarding the relevance of a codefendant's sentence, *see* COA Mot. at 7, indicates the *Lockett* line of cases does not answer the question. Thus, even if the OCCA was ultimately wrong, reasonable jurists could not debate that its decision deserves deference under federal habeas law. And despite Postelle's argument to the contrary, *see id.* at 6, the severity of the sentence at issue cannot alter this analysis.

We therefore deny Postelle permission to appeal this issue as well.

### 3. *The Actual Innocence Claim*

Finally, Postelle wishes to appeal the district court's procedural ruling denying him a stay and abatement or else leave to amend his habeas petition.

This challenge to a matter of procedure requires a somewhat different analysis, but ultimately does not warrant further review.

We begin with some additional factual background. Postelle submitted his original habeas petition to the district court on September 3, 2013. *See* R., Vol. I at 10. Over a year and a half later, he moved for the district court to stay and abate habeas proceedings or otherwise permit him to amend his petition with an actual-innocence claim. *See id.* at 488. This was because David Postelle had contacted Postelle's attorneys and confessed to the murders. *See id.* at 491. David claimed he had directed Postelle not to discuss the events of the crime with anyone—even his own counsel—and that Postelle did not actually shoot anyone. *See id.* at 518–21 (David Postelle letter). On account of this new evidence, Postelle moved for the court to stay federal proceedings to allow him to exhaust claims of actual innocence (and possibly interference with counsel) in the Oklahoma courts. *See id.* at 491. In the alternative, he asked for leave to amend his petition "to add facts, argument, and authorities based upon the confession of his older brother." *Id.* He further asked for leave to newly assert "a constitutional claim of actual innocence." *Id.*[11]

---

[11] For the sake of argument, we accept Postelle's contention that "a truly persuasive demonstration of actual innocence . . . would render [his] execution . . . unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." COA Mot. at 15 (quoting *Herrera v. Collins*, 506 U.S. 390, 417 (1993)). *But cf. Doe v. Jones*, 762 F.3d 1174, 1176

(continued...)

The district court denied these requests. *See* Dkt. 71 at 2. First, it thought a stay and abatement "inappropriate in this situation" because Postelle sought "to exhaust claims to add to his existing petition" rather than "exhaust claims that are included in his petition." *Id.* at 3. Next, the district court rejected Postelle's request to amend his petition, reasoning that the new claims did not derive from the same operative facts as the old claims, and therefore the amendment could not relate back to the original habeas petition. *See id.* at 3–5. Accordingly, the amendment would fall outside the statute of limitations. *Id.* at 4. Equitable tolling was also unavailable because David's confession was not reliable, nor did it present "new" evidence in the relevant sense. *Id.* at 6–8.

The district court thus construed Postelle's motion not as a request for a stay or leave to amend, but as a second habeas petition. *See id.* at 9. Accordingly, it transferred the petition to this court for us to decide whether to authorize it as such. *Id.*; *see* 28 U.S.C. § 2244(b)(3)(A). We reserved judgment on that question pending resolution of this appeal. *See In re Postelle*, No. 16-6237, unpublished order at 3 (10th Cir. Oct. 18, 2016).

Postelle now moves for permission to appeal the district court's rejection of his requests for a stay or leave to amend his petition. *See* Mot. at 8–15. To

---

[11](...continued)

n.5 (10th Cir. 2014) (acknowledging the Supreme Court has never resolved whether such a claim exists).

appeal a procedural ruling in a habeas action, "a litigant . . . must demonstrate that" the "ruling . . . is itself debatable among jurists of reason" *Buck v. Davis*, 137 S. Ct. 759, 777 (2017). We deny this motion because reasonable jurists could not debate the district court's procedural ruling.

To begin, Postelle gives the court no reason to doubt the district court's holding that it could not stay and abate habeas proceedings for exhaustion of a claim not yet before the court. *See* Mot. at 11–15. And indeed, the Supreme Court's decision in *Rhines v. Weber*, 544 U.S. 269 (2005), approving of the stay-and-abatement process for raised but unexhausted claims does not appear to apply to claims not yet raised at all. *See* id. at 275–79 (discussing the procedure only with regard to "mixed" petitions containing both exhausted and unexhausted claims). We thus deem the district court's resolution of that issue undisputably within its discretion.

Neither does Postelle directly address the district court's treatment of the amendment issue. And rightfully so, as reasonable jurists could not debate it either.

A habeas petition "may be amended or supplemented as provided in the rules of procedure applicable to civil actions." 28 U.S.C. § 2242. Under the Federal Rules of Civil Procedure, a party generally has an absolute right to amend his pleading once within 21 days of its service. *See* Fed. R. Civ. P. 15(a)(1)(A). Once that window has passed—and in this case it certainly has—a party needs his

opponent's consent or leave of court to file an amendment.  *See id.* at 15(a)(2).

And even though courts should grant this leave freely, *see id.*, federal habeas law

strictly limits the circumstances under which an amendment can relate back to the

original petition filing.  As relevant here, it may do so "*if and only if* . . . the

proposed amendment does not seek to add a new claim or to insert a new theory

into the case."  *United States v. Espinoza-Saenz*, 235 F.3d 501, 505 (emphasis

added) (quoting *United States v. Thomas*, 221 F.3d 430, 431 (3d Cir. 2000); *see*

*also Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001) ("Although

this petition was brought under § 2254 rather than § 2255, we see no reason to

treat the issue differently.").  Postelle's amendment exclusively seeks to add new

claims to the case under new theories of the facts.  Accordingly, his actual-

innocence claim could not possibly relate back to the original filing absent

equitable tolling.  Postelle thus attacks only the district court's treatment of the

equitable tolling issue.

He cannot prevail on this theory.  To be sure, a valid claim of actual

innocence might render Postelle's amendment timely and bypass the relation-back

problem altogether.  *See Gibson v. Klinger*, 232 F.3d 799, 808 (10th Cir. 2000).

But "[t]o be credible, such a claim requires petitioner to support his allegations of

constitutional error with new reliable evidence—whether it be exculpatory

scientific evidence, trustworthy eyewitness accounts, or critical physical

evidence—that was not presented at trial."  *Schlup v. Delo*, 513 U.S. 298, 324

(1995).  Moreover, "[t]o establish the requisite probability" that a miscarriage of justice will occur absent equitable tolling, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."  *Id.* at 327.

Postelle faults the district court for conducting a "deep dive into the merits" of his actual-innocence claim to carry out this analysis.  *Id.* at 11.  According to Postelle, the district court "should have [only] asked . . . whether [David's] affidavit raised a debatable question of . . . Postelle's ineligibility for the death penalty."  *Id.*  But that simply is not the law.  Even assuming it constituted "new reliable evidence," *but cf. Hubbard v. Pinchak*, 378 F.3d 333, 340 (3d Cir. 2004) ("A defendant's own late-proffered testimony is not 'new' because it was available at trial."), the question before the district court was whether any reasonable juror could have found Postelle guilty beyond a reasonable doubt in light of David's statement.  On appeal, we would review its decision for abuse of discretion.  *See Espinoza-Saenz*, 235 F.3d at 503; *cf. Carter v. Bigelow*, 787 F.3d 1269, 1278 & n.6 (10th Cir. 2015) (observing the abuse-of-discretion standard applies to denials of motions to supplement as well as motions to amend).

Accordingly, the question before us now is whether reasonable jurists could debate the district court's exercise of discretion concluding reasonable jurists could still convict Postelle in the face of David's statements.  For obvious reasons, this is not a close call.  David Postelle's letter cannot wash away the

mountain of other evidence presented at trial, including a directly contradictory account from another eyewitness.  Reasonable jurors could easily disregard David's account.  Accordingly, the court below clearly and undisputably rendered a decision within the bounds of its discretion on this issue.

* * *

For these reasons, we deny Postelle a Certificate of Appealability covering additional issues.

## III.  Conclusion

For the forgoing reasons, we **AFFIRM** the district court's denial of habeas relief and **DENY** Postelle's motion to expand the Certificate of Appealability.

16-6290, <u>Postelle v. Carpenter</u>

**LUCERO**, J., concurring in part and dissenting in part.

I join all but Part II.A of the majority opinion.  Two issues prevent my full agreement with my respected colleagues that would lead to my full joinder.  (1) It was well-known that bias in the IQ tests used at the time of Postelle's sentencing skewed the scores introduced at trial and presented to the jury to a degree significantly lower than Postelle's true score.  Given that Postelle scored in the bottom one tenth of one percentile of children his age on an adaptive behavioral test administered when he was a child, evidence of the IQ score bias—known as the Flynn Effect—should have been fully developed by trial counsel.  Failure to do so resulted in manifest prejudice to the defendant, amplified by counsel's presentation of scores evincing a higher degree of mental capacity than justified, compounding the error to a reversible degree.  (2) My majority colleagues' suggestion that defense counsel can delegate development of the overall litigation strategy and investigation of the law to a testifying psychologist is clearly erroneous.  Although the bar to relief is high under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), adequate representation by counsel, particularly in a capital case, mandates a complete investigation and presentation of mitigating evidence.  The failure to fulfill that duty by counsel in the case before us compels me to respectfully dissent.

# I

The majority opinion capably lays out the facts of the crime for which Gilbert Postelle was convicted.  It omits, however, a considerable amount of evidence presented in mitigation and on appeal, which provides necessary background.  In context, counsel's

failure to raise the Flynn Effect violated Postelle's right to effective assistance of counsel under Strickland.

Assuredly, trial counsel did present evidence that Postelle's childhood was highly dysfunctional and that he had been seriously mentally impaired since childhood. Postelle's maternal aunt and his sister testified that mental illness ran in his family. His mother, Dawn, was so mentally ill that, at the time of trial, she was committed to an inpatient mental institution in Arizona. The defense's expert witness, Dr. Ruwe, testified that Postelle suffered from significant neurocognitive problems and severe psychological problems. Later, upon being provided with a complete family history by post-conviction counsel, Dr. Ruwe diagnosed Postelle with major depressive disorder with psychotic features, and found that he exhibited symptoms of post-traumatic stress disorder and possible schizophrenia.

Dr. Ruwe's testimony at the sentencing phase of the trial merely touched upon his analysis of Postelle's mental state, despite the fact that "courts have repeatedly found [evidence of mental illness] to be powerful mitigation." Wilson v. Sirmon, 536 F.3d 1064, 1093 (10th Cir. 2008). Counsel on direct appeal failed to conduct any further investigation, despite the indications present in the trial transcript that mental illness may have been a viable mitigation claim, and that Postelle's "borderline" IQ scores might not accurately capture his mental capacity. Only collateral counsel completed the basic investigation that unearthed the depth of Postelle's cognitive and psychological issues. This failure may have to do with the fact that Postelle was, according to his counsel on direct appeal, incapable of meaningfully assisting her. He failed to disclose any

information regarding the facts of the crime to his lawyers or their investigators, and appeared to be ignorant of the seriousness of the proceedings and the nature of his sentence.  Post-conviction counsel confirmed the impressions of direct appeal counsel, reporting that when they attempted to discuss Postelle's case with him he spent "most of the time giggling, laughing inappropriately, and staring up at the ceiling."

Multiple individuals who had known Postelle throughout his life testified that he had significant mental impairments from a very young age:  he was "different from the rest of the kids," "accident prone," and "slow at processing things."  He "believed everything he was told," "couldn't understand when people were joking," and took frequent and unnecessary risks.  Many of Postelle's friends and family members reported that they had not been contacted by any of Postelle's lawyers, save his post-conviction counsel, and that if they had been, they would have testified to their observation of Postelle's mental disability.  Others indicated that, although they had spoken to Postelle's trial attorneys, they were not asked about his mental health, cognitive function, or family history of mental illness.

School records presented at trial indicated that Postelle was removed from mainstream schooling and placed in special education early in elementary school, where he remained until he dropped out of school at the age of twelve.  In 1999, shortly before leaving school, Postelle was given an Adaptive Behavior Inventory, a type of adaptive functioning test, and scored in the bottom 0.1 percentile—that is, about 99.9 percent of children his age outperformed him.  According to this assessment, at the age of twelve, when most children would be finishing sixth grade, Postelle was "beginning" to use

spoken language to convey information to others, read a few simple sight words, and

become aware of the perceptions of others.  He was unable to answer questions about a

story he had just read, convey knowledge in writing, do work independently without

disturbing others, or make appropriate comments in group situations.  He had not

mastered any skills, including telling time or knowing the names and values of coins and

bills.

In November 2006, Postelle took the Wechsler Adult Intelligence Scale, Third

Edition ("WAIS-III") and scored a 79.  In March 2007, Postelle took the Wechsler

Abbreviated Scale of Intelligence ("WASI") and received a score of 76.  Without

adjustment for either the standard of error or the Flynn effect, these scores fell within the

range considered to indicate "borderline mental disability."  See T.P. Alloway, Working

Memory and Executive Function Profiles of Individuals with Borderline Intellectual

Functioning, 54 J. Intell. Disability Res. 448, 449 (2010).  People with borderline mental

disability generally have limited skills related to planning, decision making, and spoken

language.  Marsha Mailick Seltzer et al., Life Course Impacts of Mild Intellectual

Deficits, 110 Am. J. Mental Retardation 451, 451 (2005).

## II

In Lockett v. Ohio, 438 U.S. 586 (1978), the Supreme Court struck down a state

statute that provided that the death penalty was mandatory for certain crimes, unless one

of three potentially mitigating factors applied.  Id. at 593-94.  The Court noted that "the

concept of individualized sentencing" had long been a central principle of American law

and that sentencing judges had traditionally been able to consider a wide variety of facts

about the offender and the crime itself.  Id. at 602-03.  In capital cases particularly, "the

fundamental respect for humanity underlying the Eighth Amendment" requires

individualized consideration of the particular offender and offense "as a constitutionally

indispensable part of the process of inflicting the penalty of death."  Id. at 603 (quotation

omitted).

Therefore, the Eighth and Fourteenth Amendments require that the sentencer "not

be precluded from considering, as a mitigating factor, any aspect of a defendant's

character or record and any of the circumstances of the offense that the defendant proffers

as a basis for a sentence less than death."  Id. at 604.  Because Ohio's statute did not

permit such consideration, it was held unconstitutional.  Id. at 608.  This requirement that

individual mitigating factors be considered in imposing death reflects "the law's effort to

develop a system of capital punishment at once consistent and principled but also humane

and sensible to the uniqueness of the individual."  Eddings v. Oklahoma, 455 U.S. 104,

110 (1982).

The Eddings Court expanded on Lockett's directive.  Monty Eddings, who was

sixteen when he killed a police officer, had experienced an extremely difficult upbringing

and suffered from severe emotional and psychological disorders.  Id. at 105-06.  In

sentencing him to death, the trial judge noted that he had considered Eddings' youth but

could not, under the law, consider the abuse Eddings experienced as a child or his various

mental afflictions.  Id. at 108-09, 112-13.  The Oklahoma Court of Criminal Appeals

("OCCA") affirmed, holding that Eddings' "family history" and mental illness were

"useful in explaining why he behaved the way he did" but could not be used in mitigation

- 5 -

because it "did not excuse his behavior." Id. at 109-10.  The Supreme Court reversed, concluding that "[e]vidence of a difficult family history and of emotional disturbance" is relevant mitigating evidence.  Id. at 114.  It might have been permissible for the sentencing authority to conclude that, as a matter of fact, there was insufficient evidence of mental illness or child abuse, but it was not permissible to determine that such evidence could not properly be considered.  Id.

Evidence of emotional disturbance and violent family history, including an alcoholic mother and a physically abusive father, was determined particularly relevant because Eddings was young at the time of the crime.  Id. at 116.  The Court reasoned that, at sixteen, an average adolescent might be expected to lack the maturity of an adult and, given Eddings' severe emotional problems, violent family background, and below-average intelligence, he was perhaps even less mature than his chronological age would suggest.  Id.  Mitigating facts of his mental illness and his difficult background did not excuse his crime, but "the background and mental and emotional development of a youthful defendant [must] be duly considered in sentencing."  Id.

Under Lockett and Eddings, Postelle clearly had a broad right to bring in a wide variety of mitigating evidence, provided that it related to his own personal characteristics or to the circumstances of the crime.  Further, under Strickland, he had the right to counsel to adequately represent him.  Adequate representation in the capital context has long been understood to mean a reasonable, complete investigation and presentation of mitigating evidence.  Williams v. Taylor, 529 U.S. 362, 396 (2000).

In <u>Williams</u>, the Supreme Court reversed a death sentence because the defendant's counsel had failed to adequately investigate and present evidence of his intellectual disability and abusive childhood.  <u>Id.</u>  Williams' trial counsel failed to obtain records that would have revealed that Williams had been severely beaten by both of his parents as a child.  <u>Id.</u> at 395.  Counsel also failed to introduce evidence available at the time of trial indicating that Williams was "borderline [intellectually disabled]" and did not advance beyond sixth grade.  <u>Id.</u> at 396.  Not all of the evidence regarding Williams' background was favorable to him, but the Court concluded that a tactical decision to focus on another aspect could not have justified the omission of the "voluminous" amount of evidence in Williams' favor, and that their omission could only indicate a failure to investigate the client's background.  <u>Id.</u>

In <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), the Court again reversed a death sentence due to trial counsel's inadequate investigation into mitigation evidence.  There, trial counsel hired a psychologist and researched both social service records and the defendant's presentence investigation report.  <u>Id.</u> at 524.  Yet these efforts were determined to be inadequate because counsel had failed to hire a forensic social worker to prepare a social history report.  <u>Id.</u>  The Court held this failure, despite counsel's other investigative efforts, fell short of the American Bar Association's requirement that counsel make "efforts to discover <u>all reasonably available</u> mitigating evidence."  <u>Id.</u> (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), 93 (1989)).  The Court concluded that competent counsel, knowing the extent of the abuse that Wiggins suffered, would have investigated further

and then introduced mitigating evidence related to that abuse at trial.  Id. at 535.  Due to counsel's failure to investigate, the jury did not hear evidence that the defendant had been frequently abused and neglected by his alcoholic mother.  Id.  The jury also did not hear that Wiggins had significantly diminished mental capacities.  Id.  The omission of this "considerable mitigating evidence" meant that Wiggins was deprived of constitutionally adequate counsel.  Id. at 536.

In Rompilla v. Beard, 545 U.S. 374 (2005), trial counsel interviewed five of the defendant's family members and employed three mental health experts.  Id. at 381-82.  Despite knowing that Rompilla had a criminal record and had left school in the ninth grade, trial counsel did not examine the records of his schooling or his prior incarcerations.  Id. at 382.  The Supreme Court once again overturned the sentence, holding that, if his counsel had located and read these records—especially his easily available criminal records—they would have found a range of mitigation leads, including a suggestion that he was cognitively impaired and suffered from schizophrenia.  This would have built a stronger mitigation case.  Id. at 390-91.

In summary, investigation and presentation of mitigation evidence is a vital function of counsel in a capital punishment penalty phase trial.  Wiggins, 539 U.S. at 522; Eddings, 455 U.S. at 112.  "[A] consistency produced by ignoring individual differences is a false consistency."  Eddings, 455 U.S. at 112.  Evidence of a defendant's abusive family background, lack of education, and reduced cognitive capacity is particularly strong mitigating evidence.  Wiggins, 539 U.S. at 535.

## III

By the time of Postelle's trial in 2008, the Flynn Effect was sufficiently well observed and documented that a reasonable capital defense attorney, preparing for a presentation of mitigating evidence, should have discovered and presented it. Particularly, given that the materials available to and used by trial counsel indicated that Postelle left school at twelve after experiencing learning difficulties, suffered significant childhood trauma, and had reduced mental capabilities, counsel had a duty to competently research diminished mental capacity.  Had counsel done so, they would have discovered the Flynn Effect, adding significant weight to the contention that Postelle's crime was mitigated by his level of mental impairment.

As the majority opinion ably explains, the Flynn Effect is an observed phenomenon in which IQ scores increase by approximately 0.3 points for every year that has elapsed since the test was normed.  (Majority Op. 8-10.)  James R. Flynn first observed the phenomenon in 1984 (24 years before Postelle's trial) when he noted that, between 1932 and 1978, the IQ score of a representative sample of Americans rose an average of 13.8 points.  James R. Flynn, The Mean IQ of Americans:  Massive Gains 1932 to 1978, 95 Psych. Bull. 29, 29 (1984).  By the time of Postelle's trial in 2008, the Flynn Effect had not only gained acceptance within the scientific community but was commonly mentioned in capital punishment cases.  See, e.g., People v. Superior Court

(Vidal), 40 Cal. 4th 999, 1006 n.4 (2007), and the voluminous collection of cases in

footnote 1.[1]

---

[1] Other pre-2008 cases in which courts have discussed the Flynn Effect include
Cole v. Branker, No. 5:05-HC-461-D, 2007 WL 2782327, at *22 (E.D.N.C. Sept. 20,
2007) (unpublished) (rejecting a Flynn Effect argument on the basis that the defendant
did not explain how the Flynn Effect would show evidence of intellectual disability
before age 18); Moore v. Quarterman, 491 F.3d 213, 231 (5th Cir. 2007), overruled on
other grounds by Moore v. Quarterman, 533 F.3d 338 (5th Cir. 2008) (en banc)
(acknowledging that a defendant's IQ score was reduced to account for the Flynn Effect);
People v. Superior Court (Vidal), 40 Cal. 4th 999, 1007 (2007) (noting the lower court's
acceptance of the Flynn Effect's validity); Williams v. Campbell, No. 04-0681-WS-C,
2007 WL 1098516, at *47 (S.D. Ala. Apr. 11, 2007) (unpublished) (acknowledging the
potential impact of the Flynn Effect); In re Mathis, 483 F.3d 395, 398 n.1 (5th Cir. 2007)
(noting a Flynn Effect argument articulated below without addressing it); Green v.
Johnson, No. 2:05cv340, 2007 WL 951686, at *12 (E.D. Va. Mar. 26, 2007)
(unpublished) (indicating that the Flynn Effect was properly considered in analyzing a
defendant's IQ score); Winston v. Warden of the Sussex I State Prison, No. 052501, 2007
WL 678266, at *15 (Va. Mar 7, 2007) (unpublished) (rejecting a Flynn Effect argument
on the basis that the Flynn Effect would not show evidence of intellectual disability
before age 18); Ex parte Blue, 230 S.W.3d 151, 166 (Tex. Crim. App. 2007) (declining to
consider a Flynn Effect argument); United States v. Parker, 65 M.J. 626, 629 (N-M. Ct.
Crim. App. 2007) (indicating that the Flynn Effect is properly considered in analyzing a
defendant's IQ score); Wiley v. Epps, No. 2:00CV130-P-A, 2007 WL 405041, at *37
(N.D. Miss. Feb. 2, 2007) (unpublished) (noting defendant's argument that the Flynn
Effect had been widely known since it was first discovered in 1984); Green v. Johnson,
No. CIVA 2:05CV340, 2006 WL 3746138, at *46 (E.D. Va. Dec. 15, 2006)
(unpublished) (concluding that it is necessary in capital cases to adjust IQ scores to
reflect the Flynn Effect); Van Tran v. State, No W2005-01334-CCA-R3-PD, 2006 WL
3327828, at *12 (Tenn. Crim. App. Nov. 9, 2006) (unpublished) (describing post-
conviction testimony regarding the Flynn Effect); Berry v. Epps, No. 1:04CV328-D-D,
2006 WL 2865064, at *35 (N.D. Miss. Oct. 5,2006) (unpublished) (mentioning post-
conviction counsel's attempts to admit Flynn Effect evidence); Murphy v. Ohio, No. 3:96
CV 7244, 2006 WL 3057964, at *5 (N.D. Ohio Sept. 29, 2006) (unpublished)
(concluding that a state court's refusal to incorporate the Flynn Effect was not reviewable
given the procedural posture of the instant case); Conaway v. Polk, 453 F.3d 567, 592
n.27 (4th Cir. 2006) (mentioning the Flynn Effect's potential impact on IQ scores);
Moore v. Quarterman, 454 F.3d 484, 499 (5th Cir. 2006), overruled on other grounds by
Moore v. Quarterman, 533 F.3d 338 (5th Cir. 2008) (en banc) (noting that the defendant's
IQ scores were adjusted to reflect the Flynn Effect); Green v. Johnson, 431 F. Supp. 2d
601, 612-617 (E.D. Va. 2006) (granting the defendant's request for an evidentiary

hearing to determine whether he was intellectually disabled, based in part on Flynn Effect evidence); Hedrick v. True, 443 F.3d 342, 368 (4th Cir. 2006) (discussing the defendant's failure to raise the Flynn Effect); In re Salazar, 443 F.3d 430, 433 (5th Cir. 2006) (indicating that, even assuming the validity of the Flynn Effect, the defendant's scores were still too high to meet the intellectual disability cutoff); Melican v. Morrisey, No. 041368B, 2006 WL 1075465, at *6 (Mass. Mar. 13, 2006) (unpublished) (assuming the validity of the Flynn Effect); Walton v. Johnson, 440 F.3d 160, 177-78 (4th Cir. 2006) (rejecting a Flynn Effect argument on the basis that the defendant did not explain how the Flynn Effect would render his IQ lower than the cutoff); Ex parte Salazar, No. WR-49,210-02, 2006 WL 8430173, at *1 (Tex. Crim. App. Mar. 9, 2006) (unpublished) (rejecting a Flynn Effect argument on the grounds that the Flynn Effect would not render the defendant's IQ lower than the cutoff); Cummings v. Polk, No. 5:01-HC-910-BO, 2006 WL 4007531, at *31 (E.D.N.C. Jan. 31, 2006) (unpublished) (acknowledging Flynn Effect testimony presented at trial); State v. Burke, No. 04AP-1234, 2005 WL 3557641, at *12 (Ohio Ct. App. Dec. 30, 2005) (unpublished) (concluding that a trial court considering an Atkins claim must consider Flynn Effect evidence); White v. Commonwealth, 178 S.W.3d 470, 485, n.5 (Ky. 2005) (defining the Flynn Effect); Myers v. State, 130 P.3d 262, 268 n.11 (Okla. Crim. App. 2005) (defining the Flynn Effect); Black v. State, No. M2004-01345-CCA-R3-PD, 2005 WL 2662577, at *16, 39-40 (Tenn. Crim. App Oct. 19, 2005) (unpublished) (rejecting a Flynn Effect argument on state law grounds); People v. Superior Court (Vidal), 129 Cal. App. 4th 434, 450, 559 (Cal. Ct. App. 2005) (indicating that the Flynn Effect was generally accepted in the clinical field in 2005); Walton v. Johnson, 407 F.3d 285, 296 (4th Cir. 2005) (rejecting a Flynn Effect argument on the basis that the defendant did not explain how the Flynn Effect would show manifestation of intellectual disability before age 18); Bowling v. Commonwealth, 163 S.W.3d 361, 374-75 (Ky. 2005) (rejecting a Flynn Effect argument); Walker v. True, 399 F.3d 315, 322-23 (5th Cir. 2005) (remanding for the district court to consider the Flynn Effect); State v. Murphy, No. 9-04-36, 2005 WL 280446, at *2 (Ohio App. Feb. 7, 2005) (noting Flynn Effect evidence presented in post-conviction proceedings); In re Hicks, 375 F.3d 1237, 1242-43 (11th Cir. 2004) (Birch, J., dissenting) (arguing the importance of Flynn Effect evidence in calculating a capital defendant's IQ); Walton v. Johnson, 269 F. Supp. 2d 692, 699 n.5 (W.D. Va. 2003), judgment vacated by Walton v. Johnson, 407 F.3d 285 (4th Cir. 2005) (rejecting a Flynn Effect argument on the basis that the defendant did not explain how the Flynn Effect would show manifestation of intellectual disability before age 18).

During the same time frame, a number of articles in legal journals and law reviews also noted the Flynn Effect's importance.  See, e.g., Dora W. Klein, Categorical Exclusions from Capital Punishment, 72 Brook. L. Rev. 1211, 1231 n.89 (2007); Richard J. Bonnie & Katherine Gustafson, The Challenge of Implementing Atkins v. Virginia: How Legislatures and Courts Can Promote Accurate Assessments and Adjudications of Mental Retardation in Death Penalty Cases, 41 U. Rich. L. Rev. 811, 837-38, 841, 844 (2007); Ana Romero-Bosch, Lessons in Legal History—Eugenics & Genetics, 11 Mich.

Postelle's IQ has been tested twice.  First, in November 2006, he scored a 79. When adjusted for the Flynn Effect, this score falls to 74.  See James R. Flynn, The WAIS-III and WAIS-IV:  Daubert Motions Favor the Certainly False over the Approximately True, 16 Applied Neuropsychol. 98, 103 (2009).[2]  In March 2007, he scored a 76.  Deducting the standard 0.3 points for each year between when the WASI was normed and when Postelle took it, this score also becomes a 74.  Additionally, the statistical analysis built into these tests themselves is not perfect.  Because the score produced is not entirely certain, each test produces a 95 percent confidence interval—a range of values such that there is a 95 percent probability that the true IQ score lies within it.  Postelle's original, unadjusted WAIS-III test indicated that there was a 95 percent probability that his true IQ score was between 75 and 83.  When corrected for the Flynn Effect, this range drops by five points, so that Postelle's IQ score in fact likely falls between 70 and 78.  His second test, the WASI, produced a 95 percent confidence interval of 72 to 81. The Flynn Effect when applied to that second test shows that, in fact, there is a 95 percent probability that his true score lies between 70 and 79.

---

St. U. J. Med. & L. 89, 105 n.96 (2007); James R. Flynn, Tethering the Elephant:  Capital Cases, IQ, and the Flynn Effect, 12 Psychol. Pub. Pol'y & L. 170 (2006); J. Philippe Rushton & Arthur R. Jensen, Wanted:  More Race Realism, Less Moralistic Fallacy, 11 Psychol. Pub. Pol'y & L. 328, 330 (2005); Justin B. Shane, Case Note, 17 Cap. Def. J. 481 (2005); Linda Knauss and Joshua Kutinsky, Into the Briar Patch:  Ethical Dilemmas Facing Psychologists following Atkins v. Virginia, 11 Widener L. Rev 121, 127-28 (2004); LaJuana Davis, Intelligence Testing and Atkins:  Considerations for Appellate Courts and Appellate Lawyers, 5 J. App. Prac. & Process 297, 309 (2003).

[2] Flynn has continually updated and refined his conclusions, particularly about the WAIS-III.  Although the data used above were published in 2009, Flynn's earlier hypotheses would have led to an even larger downward adjustment and would have indicated that Postelle's corrected test result was instead a 73.  Id.

Instead of presenting evidence that Postelle's correct IQ score was 74 and could in fact be as low as 70, however, his counsel presented evidence that it was either a 76 or a 79. No party made any mention of the Flynn Effect during his trial or his direct appeal. It was first mentioned by the defense at the post-conviction relief stage. After Postelle argued that his trial and appellate counsel should have introduced evidence that would have more accurately captured his IQ score, both for the purpose of challenging whether he could constitutionally be executed under Atkins v. Virginia, 536 U.S. 304 (2002), and for the purpose of mitigation, the OCCA addressed only the first argument, without mention of the second potential purpose of this evidence.

By failing to address Postelle's argument that the Flynn Effect evidence could be used for the purpose of mitigation rather than merely for the purpose of determining whether Atkins applied, the OCCA failed to adjudicate Postelle's claim on its merits.[3] Thus, the deferential standard of review usually required by the Antiterrorism and Effective Death Penalty Act does not apply in this case. 28 U.S.C. § 2254(d); see also Chadwick v. Janecka, 312 F.3d 597, 606 (3d Cir. 2002); Grant v. Royal, 886 F.3d 874, 889 (10th Cir. 2018); Grant, 886 F.3d at 961, 967-70 (Moritz, J., dissenting). Instead, "we exercise our independent judgment and review the federal district court's

---

[3] The majority correctly notes that, under Johnson v. Williams, 133 S. Ct. 1088 (2013), when a state court adjudicates some but not all of a petitioner's claims, we presume that the court adjudicated all of the claims and rejected them on the merits. (Majority Op. 19 n.7.) However, the state court's opinion—which emphasized the potential use of the Flynn Effect to show that Postelle was ineligible for capital punishment under Atkins, without mentioning the evidence's potential second use as mitigation evidence—suggests that the court may have instead misconstrued the mitigation argument as the Atkins argument, rather than merely rejecting it on the merits.

conclusions of law de novo, and its factual findings for clear error."  Grant, 886 F.3d at 889 (quotations omitted).  See also Hooks v. Workman, 689 F.3d 1148, 1163-64 (10th Cir. 2012).

The majority opinion holds that the OCCA's failure to address the mitigation-related argument was excusable because Postelle's counsel's failure to identify and present Flynn Effect evidence did not rise to the level of constitutional inadequacy under Strickland.  The majority argues first that the defense counsel relied legitimately on its expert witnesses given that the expert witness defense counsel consulted, Dr. Ruwe, did not raise the Flynn Effect.  (Majority Op. 21-23.)  This argument misapprehends the role of experts.  An expert witness provides testimony that bolsters the litigation strategy created by counsel.  This is why counsel often retains multiple consulting experts, some of whom never testify at trial.  See Loren Kieve, Retaining an Expert, in Litigators on Experts, 18, 18 (Wendy Gerwick Couture & Allyson W. Haynes eds., 2011).  The concept of an independent expert—one who might contradict, undermine, or revise counsel's litigation strategy—is virtually unheard of in American law.  Ellen Deason, Court-Appointed Expert Witnesses: Scientific Positivism Meets Bias and Deference, 77 Or. L. Rev. 59, 65 (1998).

The legal duty to fully investigate and develop a particular aspect of a client's case, particularly in the capital context, is not delegated to an expert merely because one is hired.  Investigation of the facts and legal parameters of a case and the expert's field should guide the retention and use of an expert.  It was counsel's duty to hire experts who would testify to conclusions that the attorneys felt would advance their client's cause.  In

Postelle's case, his counsel hired an expert who testified that he was <u>not</u> intellectually disabled.  Given the defendant's background and available mitigation evidence, that is <u>not</u> a reasonable litigation strategy.  Counsel cannot now fall back on that expert for their failure to introduce additional evidence that would contradict those conclusions and develop a potentially successful result.  An expert's role is not to assume the role of counsel but to assist in the presentation of a case in its best light.  Thus, the experts hired in Postelle's trial cannot serve to inoculate his counsel against claims of constitutional inadequacy.

The Supreme Court's opinion in <u>Rompilla</u> further demonstrates that the retention of an expert witness does not necessarily demonstrate that trial counsel adequately represented the defendant.  In that case, trial counsel retained three mental health experts but failed to review records of the defendant's prior convictions, which would have shown that he had exhibited symptoms of serious mental health issues.  The Court noted that, although the mental health experts' reports had indicated a "benign conception of Rompilla's upbringing and mental capacity," further research would have led trial counsel to question those reports and build a stronger mitigation case.  <u>Rompilla</u>, 545 U.S. at 391.  Although the majority opinion argues that an expert witness may be presumed to apply their expertise to the case (Majority Op. 25 n.9), <u>Rompilla</u> makes clear that counsel may not assume that an expert will cover the scientific field.

Similarly, in Postelle's case, expert testimony and the affidavits of family members, which trial counsel gathered, should have prompted his counsel to investigate cognitive limitations as a mitigating factor.  Not unlike the situation that prompted the

- 15 -

Supreme Court to overrule the defendant's death sentence in <u>Wiggins</u>, Postelle's trial counsel had materials that indicated he had serious mental capacity issues.  His IQ scores were borderline, his family members reported concerns about his cognitive capacities, and he dropped out of school when he was very young.  Dr. Ruwe testified that while he was competent for <u>Atkins</u> purposes, he experienced significant cognitive issues.  This range of mitigation leads should have prompted competent counsel to further investigate Postelle's cognitive capacity.  Had counsel exercised due diligence in their research, they would have discovered that the Flynn Effect could explain Postelle's IQ scores.  I stress, the Flynn Effect was well-known in 2008 in the legal field and in the scientific community:  a simple search would have discovered it.

The majority opinion further argues that Flynn Effect evidence might not have made much difference if it had been introduced for mitigation purposes.  (Majority Op. 25-30.)  The majority notes that "this is not a case where counsel simply ignored [ ] evidence or used it <u>against</u> the defendant."  (Majority Op. 30.)  However, counsel did in fact use artificially high IQ scores in a manner that cut against Postelle.  This line of reasoning misapprehends the nature of an IQ score.  A score of 75 or lower is low enough to call into serious question an individual's capacity.  As a constitutional matter, a score of 75 or below entitles a defendant to an inquiry into whether he is intellectually disabled. <u>Hall v. Florida</u>, 134 S. Ct. 1986, 2000 (2014).  As a practical matter, such a score can reasonably be expected to suggest to a jury that a defendant lacks the intellectual capacity to bear full culpability for his crimes.  On the other hand, a score above 75 suggests the opposite—it suggests, as a legal and practical matter, that the test-taker has below-

average but not deficient intellectual function.  Thus, an IQ score, by its very nature, either indicates intellectual disability or its absence.  In this case, Postelle's counsel did not merely fail to bring evidence that he had a score below 75; instead, they brought evidence that he had a score <u>above</u> 75.

I repeat:  Postelle's counsel did not merely fail to introduce evidence of Postelle's lower adjusted scores; they instead introduced scores that were erroneously high. Counsel's failure to introduce the Flynn Effect amounted not to the mere omission of mitigation evidence but rather to the introduction of evidence that went against mitigation.  These artificially high IQ scores are in tension with family testimony that Postelle had been intellectually challenged since he was a small child.  They indicated that Postelle was more intellectually capable than he was, and hence bore more responsibility for his actions than he did.

The majority opinion suggests that trial counsel could have made a strategic choice to omit evidence of the Flynn Effect.  (Majority Op. 24-25.)  To the contrary, such evidence would have served an important role within the existing mitigation strategy, not detracted from it.  Trial counsel emphasized Postelle's youth, and the extent to which methamphetamine use had impacted his brain development and educational trajectory.  A diagnosis of intellectual disability would have fit well into the defense's narrative—and significantly strengthened Postelle's mitigation case—without contradicting or undermining any of the evidence counsel did present.

The correct IQ scores would have provided valuable context to the jury for the facts of the crimes themselves.  Postelle was only eighteen at the time of the murders.  He

- 17 -

was urged to participate by his father and older brother.  As the Supreme Court has acknowledged, there is "abundant evidence that [people with intellectual disabilities] often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders." Atkins, 536 U.S. at 318.  In context, such a diagnosis would have been particularly powerful mitigation evidence.

By failing to identify and present a well-documented scientific phenomenon that had well made its way into the legal landscape of capital defense, and by neglecting to locate and present that vital evidence, Postelle's trial counsel presented a mitigation case that erroneously depicted him as more capable, more cunning, and more culpable than he was.  Ignorant of the Flynn Effect and presented with artificially high IQ scores, the jury sentenced Postelle to death.  This profound failure by Postelle's counsel erroneously deprived Postelle of his constitutional right to counsel in violation of Strickland.